**HATCO CORPORATION, Plaintiff,**

**v.**

**W.R. GRACE & CO.—CONN., Defendant, Third–Party Plaintiff,**

**v.**

**ALLSTATE INSURANCE CO., et al., Third–Party Defendants.**

**Civ. A. No. 89–1031.**

United States District Court, D. New Jersey.

Oct. 4, 1993.

As Amended Oct. 15, Dec. 3, 1993 and Feb. 18, 1994.

Aubrey M. Daniel, III, Paul Mogin, Evan Roth, Eric M. Braun, Dane Butswinkas, Williams & Connolly, Washington, DC, for plaintiff.

Thomas H. Sear, Randy Paar, Elizabeth A. Sherwin, Erik T. Sorensen, Paul N. Farquharson, Anderson, Kill, Olick & Oshinsky, New York City, for defendant-third party plaintiff Grace.

## *OPINION*

WOLIN, District Judge.

No-wax vinyl floor tiles, artificial sweetener, automobile engine protectants and sporting goods provide a few examples of the products available to ease and enrich our lives. The irony of sugar-free sweetness and these other effort-saving modern conveniences lies in the grudging chemical residues that persist in the soils and groundwater of a New Jersey coastal industrial tract from which components of these products originated.

For almost a decade this eighty-acre parcel of land and the chemical plant within its borders have served as the target of state environmental regulatory scrutiny, the object of study and debate of environmental consultants and the subject of sworn conversations with many past and present employees. These inquiries have generated a wealth of information about the facility's thirty-three years of operation and a detailed accounting of the current environmental condition of the property.

During the past four years this site also has demanded the attention, patience and resources of the Court as Hatco Corporation and W.R. Grace & Co.–Conn., the current and former owners of the facility, have sought to assign the costs of these and any future efforts to the other based on the contractual relations between them, common law principles and the legislative schemes of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and the New Jersey Spill Compensation and Control Act (the "Spill Act"). In this time, the Court rejected plaintiff's strict liability claim, limited defendant's defenses, struck plaintiff's demand for attorney's fees and dismissed defendant's first and third counterclaims.

In addition, the Court denied plaintiff's motion for summary judgment on the issue of defendant's liability for all response costs under CERCLA. In reaching this decision, however, the Court recognized the fact of defendant's liability. Thus, when the bench trial commenced on July 12, 1993, the principal task remaining for determination was the scope of defendant's liability.[1]

To aid the Court in this decision, plaintiff called two environmental experts, Dr. Dan Raviv and Dr. John Trela, both of whom are associated with Dan Raviv Associates Incorporated ("DRAI"), the environmental consulting firm plaintiff engaged to address the problems that spawned this litigation. Dr. Raviv offered an opinion on the proper apportionment of liability between the parties, and Dr. Trela gave testimony about plaintiff's remedial measures to date.

Hatco also introduced several past and present employees, including Mr. Alex Kaufman, plaintiff's president and sole shareholder, Mr. George Chryss, plaintiff's executive vice president and chief operating officer, and Mr. Harry Reid, a former assistant to Mr. Kaufman, chief engineer and consultant to Hatco. Together these witnesses traced

1. When the testimony, which was expected to fill two weeks, entered its fourth week, the Court postponed the National Contingency Plan and damages portions of plaintiff's case until September 21, 1993.

the site's history from a managerial perspective.

Grace presented two expert environmental witnesses, Dr. Charles Staples and Mr. Richard Gryzinswki. Dr. Staples presented the Court with a second opinion on the proper apportionment of liability between the parties. Mr. Gryzinswki evaluated plaintiff's plant and practices in light of the standard of environmental due care in the industry.[2]

Three and a half weeks later the parties went home, leaving behind over 3365 exhibits, unwieldy demonstrative evidence, volumes of designated deposition testimony and 3100 pages of trial testimony. At the direction of the Court, plaintiff and defendant filed proposed findings of fact on August 9, 1993 and August 25, 1993, respectively. Both parties submitted proposed conclusions of law on the eve of trial.

The size of the record underscores the complexity of the causation inquiry and the wisdom Congress exhibited in declining to require such a showing as a prerequisite to CERCLA liability. A routine stroll in other tort contexts, to resolve the causation question in the environmental arena, the Court must cross a mine field with a faded map as its guide. Despite the mass of information gathered during the parties' seemingly exhaustive search, the limitations inherent in science as well as the mandate of CERCLA compel the Court to qualify many of the answers it hands down today. Mindful of these limitations, the Court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT[3]

### BACKGROUND

### A. The Parties

1. Plaintiff Hatco Corporation ("Hatco"), a New Jersey corporation, is the present owner of the property at issue in this case.

2. Defendant W.R. Grace & Co.–Conn. ("Grace"), a Connecticut corporation, is the prior owner of the property at issue in this case and a wholly owned subsidiary of W.R. Grace & Company, a New York Corporation. (Stipulation No. 46)[4]

### B. The Property

3. The property at issue in this litigation is an eighty-acre parcel of land located in Fords, New Jersey (the "Fords property"). (Stipulation No. 1) The Fords Property is situated approximately 4000 feet from the Raritan River, (47:19 (Raviv)),[5] and is bounded to the north by King George Post Road, to the east by Sling Tail Creek, to the south by Industrial Highway and to the west by Crow's Mill Creek. (DE002)

4. The slope of the Hatco site is generally south-southwest. Groundwater flow and surface drainage events follow the site's surface topography, which is high in the center (34:13 (Raviv)), and run toward and are collected by Sling Tail Brook and Crows Mill Creek. (Stipulation No. 9)

5. The soil profile of the Hatco site, moving from the surface to the underlying soils, changes from fill with clay to light to dark gray clay to clay mixed with sand to clay to poorly sorted sand and finally to dark gray clay. (357:6 (Raviv)) The natural dark clay layer is significant because its lower permeability prevents the movement of contamination. (357:21 (Raviv))

### C. Plant History

#### 1. Ownership

6. In the early 1950s, a brick and tile manufacturer used the Fords Property as a clay pit. (Stipulation No. 2)

2. Both parties offered additional testimony through stipulations and deposition designations. A list of these witnesses appears in Appendix II.

3. A glossary of sampling and scientific terms appears in Appendix I.

4. The parties submitted eleven sets of stipulations during trial. The paragraphs of the first two sets are numbered consecutively and will be referenced by these paragraph numbers. The remaining stipulations will be cited by witness name and paragraph.

5. Due to the frequency with which the trial transcript is cited, the pages and lines of the relevant testimony and the identity of the witness will be reported as follows: (page:line (surname of witness)).

7. In approximately 1954, Mr. William Hackman ("Hackman"), the owner of the Hatco Chemical Company, purchased the Fords Property and relocated his chemical manufacturing business there. (Stipulation No. 3) The Hatco Chemical Company previously was located in Kearny, New Jersey, where it manufactured plasticizers, synthetic lubricants and napalm. (Stipulation No. 4)

8. From approximately 1954 until 1959, Hackman owned and operated the Hatco Chemical Company on the Fords property (the "Fords facility"). (Stipulation No. 5)

9. In June 1959, Grace purchased the Hatco Chemical Company from Hackman for approximately $5.4 million. (E10 at WRG 06767) The business became a division of Grace known as the Hatco Chemical Division.[6] (Stipulation No. 6)

10. Hackman remained at the helm of the Hatco Chemical Division until 1962 when Mr. Alex Kaufman ("Kaufman") became president of the Hatco Chemical Division. Kaufman held this position until his resignation in 1978. (Stipulation No. 85)

11. From 1959 until August 21, 1978, Grace owned and operated the Fords facility. On August 21, 1978, the Farben and Fuss Corporations purchased the Fords facility from Grace for $9.6 million. (E671 at H037006; 2032:18–2033:6 (Kaufman)) The Fuss Corporation ("Fuss") purchased the "Chemical Realty" of the Hatco Chemical Division. The Farben Corporation ("Farben") purchased the "Chemical Assets other than the Chemical Realty" of the Hatco Chemical Division. (Stipulation No. 7) Kaufman held controlling interests in both Fuss and Farben. (1967:6–9, 2032:18–21 (Kaufman))

12. On September 1, 1978, Farben changed its name to the Hatco Chemical Corporation. On September 30, 1978, Fuss merged into the Hatco Chemical Corporation. On October 28, 1986, the Hatco Chemical Corporation was renamed the Hatco Corporation. (Stipulation No. 8)

2. **Manufacturing**

13. Upon arrival at the Fords property in 1954, the Hatco Chemical Company had one reactor, one stripper, one refiner, a filter press and tanks. (1878:5 (Kaufman))

14. From approximately 1954 until 1959, two plants were in operation at the Hatco Chemical Company: (1) an esterification plant (Ester I) where plasticizers and synthetic lubricants, including dioctyl phthalate, dibutyl phthalate and diisooctyl phthalate, were manufactured from acids and alcohols; and (2) a sebacic acid plant where raw materials were generated to make aviation turbine oils. (Stipulation No. 5; (1882:9) (Kaufman))

15. During this period, alcohols, sebacic acid and phthalic anhydride were stored at the site and the railroad siding was used to load and unload tankers. (1989:22 (Kaufman)) Other raw materials brought to the site included octyl alcohol, butyl alcohol, 2–ethylhexyl alcohol and castor oil. (E10 at WRG06810; Hackman Dep. 52:12)

16. Grace's 1959 purchase brought the necessary capital for expansion. (1884:20 (Kaufman)) Besides continuing to produce various phthalate esters in the Ester I plant, during the 1960s, additional manufacturing facilities were built at the site.

17. In 1960, the Hatco Chemical Division constructed and began operating a benzyl chloride plant. The plant manufactured benzyl chloride which in turn was combined with phthalic anhydride to produce butyl benzyl phthalate ("BBP"), a plasticizer. (Stipulation No. 15) The benzyl chloride plant operated until 1965. (37:8 (Raviv); Stipulation Nos. 15, 60) Plaintiff Hatco never has manufactured butyl benzyl phthalate. (Stipulation No. 35)

18. In 1961 and 1963, the Hatco Chemical Division built two plants on the eastern portion of the Fords property, known as PA–1 and PA–2. These plants manufactured phthalic anhydride from naphthalene. (Stipulation No. 10) George Napack was hired to oversee the construction and operation of the PA plants. (Napack Dep. 18, 217–18)

6. To avoid unnecessary confusion, the Court will refer to the defendant as "Grace" or the "Hatco Chemical Division" and to the plaintiff as "Hatco."

19. The Hatco Chemical Division began the manufacturing operations of PA–1 in 1961 and PA–2 in 1963. (Stipulation No. 11) Production of phthalic anhydride at the two PA plants ceased in 1971. (Stipulation No. 12)

20. The Hatco Chemical Division continued to use phthalic anhydride in its operations, purchasing quantities from outside suppliers to manufacture various esters. The use of purchased phthalic anhydride at the Fords facility continues to the present day. (Stipulation No. 13)

21. While the PA plants were in operation, still bottoms from the PA production were deposited in an area to the east of the PA plants referred to as the "PA Residue Area." (Napack Dep. 47–48)

22. In 1961, the Hatco Chemical Division installed a molecular still in the Ester I Tank Farm to separate by-products manufactured in the sebacic acid plant. The molecular still was closed in 1965. (Stipulation Nos. 16, 60; 1066:2–11 (Trela))

23. In or around 1960, the Hatco Chemical Division installed two thermal units ("SH–1 and SH–2") to provide heat for a new reactor added in the Ester I plant. (E22, 23, 29) From approximately 1961 to 1966 aroclor was used as a heat transfer fluid in the hydrotherm units. (Stipulation No. 27)

24. In 1970, Grace constructed a second esterification plant ("Ester II") to manufacture DOP and other phthalate esters. (1239:21 (Reid)) The Ester II plant remains in operation today at the Fords facility.

25. After Hatco purchased the facility in 1978, it continued to manufacture a variety of plasticizers, including di-n-butyl phthalate ("DBP"), bis (2-ethylhexyl) phthalate ("DEHP"), diisodecyl phthalate and DOP. (E1043 at A301887; 186:25–187:2 (Raviv) (Hatco and Grace made same use of Ester I complex)); 2170:18–21 (Staples) (same))

26. Other chemicals that have been used and stored at the site since 1978 include benzene ("BZ"), 1,1,1–TCA ("TCA"), methylene chloride, styrene, xylene and toluene. (E968, 1241, 1737)

27. In the post–1978 period, Hatco began the manufacture of phenyl xylyl ethane ("PXE"), which required the use of xylene and styrene. (E1043 at A301975, 1410 at A301646; 1243:5 (Reid) (PXE manufacture began in early 1980s))

28. Since 1978, Hatco has used the Ester II plant to manufacture various phthalate esters, including DOP, DEHP and DIDP, and to distill PXE and TCA bottoms. (2179:22–2180:11, 2905:4–23 (Staples); Lynch Stipulation ¶¶ 6, 7; Maimon Stipulation ¶ 34; E1404)

29. In 1983, Hatco modified existing facilities and constructed a new plant at the Fords site to manufacture Z–Aspartic Acid ("ZAA"). (Maimon Stipulation ¶¶ 1–3; Napack Dep. 45:20–46:9; 152:8 (Raviv)) These facilities are located in the area of the former benzyl chloride plant. (146:16 (Raviv)) By June 1984, the ZAA facility was in the semicommercial startup phase. (1339:15 (Chryss))

30. In 1986, plaintiff Hatco dismantled the two PA plants at the Fords facility. (Stipulation No. 72)

### 3. Waste Treatment

31. Between 1954 and 1959, Hackman dug at least one settling pond at the Fords facility that was designed to handle waste by allowing product to separate from water. (1881:14 (Kaufman); 33:10–19 (Raviv); E10 at WRG06830; DE001) During this period, liquid wastes flowed into the pond system. (E10 at WRG06830) After settling, the effluent was released from the pond and flowed through marsh land into the Raritan River. *Id.;* (1891:19 (Kaufman))

32. By 1961, Grace had expanded the pond system, adding additional ponds, one of which subsequently was divided into two ponds, for a total of four ponds at the site. (E12, 15; Stipulation No. 59)

33. With the settling pond system, Grace sought to minimize the amount of process waste discharged and to recover suspended solids containing product. To accomplish these goals, Grace skimmed the esters and other organic matter that floated to the surface of the ponds and neutralized the remain-

ing liquid effluent with lime slurry. The recovered product was returned to the plant to manufacture off-color plasticizer ("OCP") to sell as a Grace product. (Stipulation No. 18)

34. While in operation, semi-solid matter accumulated in the ponds, thereby necessitating periodic cleaning. (Stipulation No. 17) Known as "demucking," this process involved scooping solid material from the bottom of the ponds. (Stipulation No. 19) The dredged material was deposited in an area west of ponds three and four known as the "muck storage area." (40:16–43:5 (Raviv))

35. From 1959 until 1971, Grace discharged waste products from the various plant operations into the ponds system. Aroclor leaks, liquid waste effluent from the Ester I and benzyl chloride plants and Ester I leaks and spills of phthalates and raw materials were discharged to the ponds. (Stipulations Nos. 31–34)

36. In 1966, Grace completed the construction of sewer lines at the site to connect the Fords facility to the Middlesex County Sewerage Authority ("MCSA"). The MCSA later changed its name to the Middlesex County Utilities Authority ("MCUA"). (Stipulation No. 20)

37. As part of the MCSA connection, Grace installed two clay-lined lagoons at the Fords facility. (Stipulation No. 21) The lagoons were designed and used, until 1971, as a temporary storage location for plant effluent prior to discharge to the MCSA. (Stipulation No. 36; Ackelsberg Dep. 204:14–20)

38. When Grace's gravity-based settling pond system and the clay-lined lagoons were in operation between 1966 and 1971, process effluent flowed from the settling ponds to the clay-lined lagoons to sewers connected to MCSA. (Stipulation Nos. 22, 36) Liquid waste from the phthalic anhydride plants was released to the lagoons and ultimately to the MCUA. (Stipulation No. 37)

39. In 1969, the New Jersey Department of Environmental Protection (the "DEP") directed the Hatco Chemical Division of W.R. Grace to eliminate the ponds because of odor problems. (Stipulation No. 24) The Hatco Chemical Division completed the pond elimination program in March 1971. (Stipulation No. 25) Plaintiff Hatco never operated the settling pond system or the muck storage areas. (Stipulation No. 26)

40. In 1990, plaintiff Hatco began operating an effluent pretreatment plant (the "EPT plant") at the Fords site. (Stipulation No. 13) The main purpose of the EPT plant was to reduce the organics in Hatco's effluent prior to its discharge to the MCUA. (715:7–14 (Raviv))

### 4. Location of Site Facilities [7]

41. Throughout the history of the site, the manufacturing and waste disposal facilities largely have been situated in the central portion of the site. In aerial photographs, this concentration of buildings and other artificial structures forms a capital letter "T" with the vertical structures traveling north to south and the horizontal improvements running east to west.

42. During Grace's ownership, the Ester I complex served as the industrial center and was bounded on the west by the Ester I Tank Farm and to the east by the two PA plants. To the south of the PA plants four large tanks, known as the "M tanks," were installed to store the naphthalene used in PA production. Continuing south from the M tanks, the Ester II building appears. West of Ester II, two railroad sidings, one serving each ester plant, run north from the southern boundary of the property.

43. Directly to the south of the Ester I complex two ponds were located, pond number one to the west and pond number two to the east. Two larger ponds were found further to the south, pond number three to the east and pond number four to the west. The sebacic acid plant was situated to the east of

7. The site description is drawn from the aerial photographs of the site presented at trial as demonstrative exhibits one through 11 and the corresponding testimony of Dr. Raviv. (32:20–49:17 (Raviv)) Knowledge of the site plan is essential to a proper understanding of the apportionment opinion which is based in part on the migration of contamination from one portion of the site to another.

ponds one and two. East of ponds three and four, the benzyl chloride plant was located. A muck storage area was created southwest of ponds three and four. At the southern boundary of the property, just west of the railroad sidings, the two lagoons were constructed.

44. Due north of these manufacturing and waste structures, a pilot plant, the quality control laboratory, the alcohol tank farm and drum storage areas were located.

45. Many of these structures remained unchanged following Hatco's purchase of the site. During the pond elimination program, Grace reclaimed the areas of the site the ponds and muck storage areas had occupied. Hatco constructed the EPT plant in the area of former pond four. Hatco also added the ZAA facility, converting the former benzyl chloride plant and constructing a new building just south of former ponds one and two.

### D. Contamination Overview

#### 1. Sampling

46. In August 1979, the DEP visited the Hatco site and took a single sample from the surface of each of the two lagoons. (1220:3–1221:10 (Reid); E699) In March 1980, DEP officials returned to the Hatco site and gathered soil samples. (1229:7–17 (Reid))

47. In 1981, the DEP selected seven groundwater monitoring well sites, beginning the first systematic testing at the Hatco facility. (214:15–23 (Raviv)) Paulus, Sokolowski and Sartor, Inc. ("PS & S"), an environmental consulting firm, installed these wells in 1982. (66:11–15 (Raviv))

48. Subsequent DEP spot sampling of the lagoons and other portions of the site occurred in 1981 (876:23 (Trela); E720), 1984 (879:6 (Trela); E825) and 1985. (883:1 (Trela); E881) The MCUA drew samples of Hatco's sewer waste water in 1986. (886:19 (Trela); E1040)

49. As a result of the DEP's continued interest in the site, in 1986 Hatco hired DRAI to provide advice with respect to the DEP's demands. (1443:3–10 (Chryss)) DRAI installed additional groundwater monitoring wells in 1987, 1990 and 1992, (65:23–66:22, 214:15–23 (Raviv)), and performed surface and subsurface soil investigations in various areas throughout the site in 1987, 1988, 1991 and 1992. (E2253) The DEP specified the groups of chemicals to be tested as well as the testing methods. (97:7–21 (Raviv))

50. Based on evidence of historical activities at the Hatco site, DRAI created areas of environmental concern ("AECs"), a basic concept in any kind of environmental investigations of plants, which allowed it to examine the impact of particular operations at relevant parts of the site. See Appendix III. (54:2–23 (Raviv)) DRAI also developed a grid system to guide its soil studies. (DE013; 64:11–19 (Raviv)) In areas where contamination was found, the density of the grid was increased in order to fine-tune its delineation. (64:20–65:22 (Raviv))

51. In 1987 and 1988 Exxon Chemical, a potential Hatco purchaser, hired Environ, an environmental consulting company, to come to the site and conduct testing. Environ examined soil and groundwater conditions at Hatco. (1472:8–20 (Chryss))

#### 2. Contaminants

52. The resulting data indicates that the Hatco site contains three principal contaminants: (1) base neutrals ("BNs"); (2) polychlorinated biphenyls ("PCBs"); and (3) volatile organic compounds ("VOCs"). (69:6 (Raviv))

53. BNs, also known as semivolatiles, are a subset of organic chemicals. (919:11 (Trela)) This category includes different phthalate esters, including DEHP, BBP, DEP, DBP and DOP, (93:4, 69:8, 75:21 (Raviv)), as well as petroleum products and naphthalene ("Naph"). (2068:2 (Staples)) BNs are the source of the greatest volume of contamination at the Hatco site. (2067:2–15 (Staples))

54. Two types of PCBs were found at the site, aroclor 1248 and aroclor 1254. When tracing the history of PCBs, it is important to evaluate reports of the presence or absence of PCBs carefully. (882:12 (Trela)) Obtaining accurate PCB results is difficult, because the applicable testing method is susceptible to interference by organic chemicals, such as the phthalate esters present at the

Hatco site. (880:5, 881:1 (Trela)) Testing of soil borings is more accurate than testing of groundwater samples. (888:6 (Trela))

55. Sampling also revealed the presence of a variety of VOCs. This category of chemicals includes solvents such as toluene, xylene, TCA, TCE and benzene. (76:3 (Raviv))

56. These pollutants are distributed throughout the site at various depths and concentrations. To some degree, each group of contaminants is present in the soils and the groundwater. Often these chemicals are commingled in the same soil. The DEP primarily is concerned with the VOC contamination in the groundwater and the PCB soil contamination. (742:4–20 (Raviv); E2453 at A216332)

## E. Apportionment of Responsibility

57. While the assignment of responsibility for the remediation of this contamination ultimately requires a judgment regarding the sufficiency of the mechanism of division, a question of law, initially the Court must explore the causation relationship and identify, as a matter of fact, the actions that led to the problems that exist at the Hatco facility.

### 1. Relevant Factors

58. It is the commingling of contaminants within the soils and groundwater that complicates attempts to draw conclusions about the relationship between site activities and contamination. This burden is not insurmountable, however, as the expert testimony at trial revealed. A number of variables distinguish the respective parties' uses of the Hatco site, including time of use, manufacturing activities and production rates. The migratory aspects of the contamination and the exclusive use of certain chemicals also guide the causation inquiry. While the utility of the former list of factors is evident, the latter category, whose members dominated the testimony at trial, merits more thorough treatment.

#### a. Exclusive Use of Chemicals

59. The causation inquiry begins with an attempt to identify the party who introduced the contamination to the site. Frequently this quest will uncover multiple sources. At the Fords facility, however, some chemicals found in the soil and groundwater can be traced with certainty to either Grace or Hatco, but not to both. For example, the record indicates that Grace served as the sole source of PCBs and that only Hatco used TCA in its manufacturing activities.

60. The utility of the exclusive use factor is limited, however, because it alone may not reveal which party is responsible for the precise distribution of contamination at the site. Nevertheless, exclusive use serves an important default function. If no evidence supports an alternate explanation for the way in which a chemical reached its current location, the party that brought the chemical at issue onto the site will retain responsibility for the resultant contamination.

##### (1) Grace

61. From approximately 1961 through 1966, Grace purchased and used heat transfer fluids at the Fords facility that contained PCBs, including aroclor 1248, aroclor 1254 and Therminol FR–2. (Stipulation Nos. 27, 29) Grace also used convaclor, a mixture of aroclors. (Stipulation No. 28)

62. Grace used aroclors in the hydrotherm units, the molecular still, the capryl still and in the manufacturing operation at PA–2. (Stipulation Nos. 28, 38; (1066:15 (Trela)) Grace used aroclor 1248 as a heat exchange fluid in the hydrotherm units and aroclor 1254 in the manufacture of OCP. (1064:5–21 (Trela))

63. Plaintiff Hatco never has purchased PCB products in conjunction with its manufacturing activities at the Fords facility. (Stipulation No. 30)

64. The PCB contamination at the Hatco site is widespread and generally is found in the areas where Grace used PCBs. (1064:25–1065:5 (Trela))

65. The evidence indicates that Grace purchased trichloroethylene ("TCE") in 1964, (255:4 (Raviv); E159), and used it to clean the hydrotherm units. (2422:19 (Staples); 1063:11–16 (Trela); E163 (Grace reporting TCE cleaning to manufacturer); 1062:5–24 (Trela); E159 (TCE purchase order))

66. There is little evidence of TCE in the sampling data. TCE is found in shallow and deep wells east of the lagoons and in a shallow well north of the lagoons. (2765:23, 2766:12 (Staples)) TCE also was detected in former ponds one and two at depths of 2–3 and 6–14 feet (2768:10 (Staples)) and ponds three and four from 4–6 ft. (2769:23 (Staples))

67. Despite suggestions to the contrary, (376:1 (only Grace used toluene) (Raviv); (2777:7) (toluene last introduced to site in 1965) (Staples)), both Grace and Hatco brought toluene to the Fords site. During Grace's tenure, toluene was a benzyl chloride production material. (E140 at 2 ¶ 4) Hatco also purchased toluene post–1978. (698:16 (Raviv); 2115:23 (Staples))

68. Lagoon samples from 1979 and 1980 contained toluene. (375:13, 809:11, 810:1 (Raviv)) Subsequent tests Hatco commissioned confirmed the initial toluene result. (2897:9 (Staples); E751) Today, in the area around and downgradient of the former benzyl chloride plant, the data reveals traces of toluene at the surface and toluene contamination in the subsurface soils. (2779:2 (Staples))

### (2) Hatco

69. From 1983 to 1990, plaintiff Hatco used 1,1,1–trichloroethane ("TCA") in the manufacture of ZAA. (811:3 (Raviv); Maimon Dep. 242:12–15; Maimon Stipulation ¶¶ 7, 10) Hatco used over 250,000 pounds of TCA annually in the production of ZAA. (E1780 at A300773; 583:6–584:4 (Raviv), 2842:14–2843:8 (Staples))

70. Hatco recovered and later distilled TCA used in the ZAA manufacturing process in the Ester II and ZAA plants. (Maimon Dep. 43:25–46:20; Maimon Stipulation ¶¶ 11, 16, 34) The distillation process created "TCA bottoms." TCA bottoms contain benzyl chloride, dibenzyl carbonate, TCA and butyl alcohol. (Maimon Dep. 46:5–20; Maimon Stipulation ¶¶ 15, 27)

71. There is no evidence that Grace purchased or used TCA at the Fords facility. (578:15 (Raviv); 2090:1 (Staples)) Although a report of 1979 DEP surface lagoon sampling results indicated the presence of TCA in the lagoons, this finding was not supported by data. (2090:8 (Staples)) Today, there is no TCA contamination upgradient of the ZAA plant of the Hatco facility. (2091:10 (Staples))

72. Xylene also is unique to the post–1978 period. (2174:12 (Staples)) Hatco used xylene in the production of PXE. (376:7 (Raviv); 2112:18 (Staples)).[8]

73. There is no evidence that Grace used xylene.[9] Although 1980 lagoon sampling of the DEP revealed the presence of xylene, (810:1 (Raviv); 2502:18 (Staples); E737), Hatco disputed this finding, (2895:3 (Staples); reading E774 at 29712; 2896:10 (Staples)), and commissioned additional tests that refuted the initial results. (2897:9 (Staples); E751; 2503:25 (Staples))

74. An August 27, 1984 analysis of a lagoon skimming sample indicated the presence of PXE. (692:5 (Raviv); E841) Xylene itself was present in a sample taken from the lagoon skimmings on October 5, 1984. (692:16 (Raviv); E847) Today xylene is found in monitoring wells 15S and 17S. (2113:6 (Staples)

### b. Migration of Contaminants

75. As indicated above, however, the Court must do more than identify the source of contamination at the Hatco facility to resolve the instant dispute; it must determine who is responsible for the distribution of contamination at the site. The interaction among chemicals and between chemicals and the environment, referred to as fate and transport analysis, controls this inquiry and

8. Styrene, another PXE raw material, was used exclusively by Hatco. (2087:23 (Staples)) A targeted chemical of the DEP but not DRAI, it is found in the lagoon sludge. (2114:24 (Staples))

9. Raviv noted that the depth and sporadic nature of xylene detected in the area of the former ponds suggests that Grace is responsible for this contamination. (376:16–378:2 (Raviv)) He was unable, however, to point to evidence of Grace xylene use or, ultimately, to endorse this conclusion with certainty. (378:3–5 (Raviv))

supplies the second portion of the causation equation.

76. Chemical fate and transport analysis is crucial to determining which of a number of activities contributed to the contamination at the site. (2080:11–20 (Staples)) If the activities of either party transport a contaminant from the location in which the other party placed it to a different location, for purposes of divisibility, the party responsible for the transport caused the contamination. (Cf. 1181:7 (Trela noting that there is more to allocation than identity of source)) The use of chemical fate and transport analysis in the assessment of environmental property damage has been endorsed by the United States Environmental Protection Agency ("EPA"). (2116:18–2117:12 (Staples))

### (1) General Dynamics

77. Various properties unique to each chemical determine the ways in which chemicals react with the environment and with each other. These attributes include density, volatility, degradability, solubility in water, solubility in other chemicals, and the tendency to adsorb or stick to soils. (2080:21–2081:11 (Staples)) The profile generated by these properties helps predict the behavior of chemicals and discern the cause of environmental harm.

78. The place in which a chemical is introduced into the environment also affects its migratory potential. Above the water table, contaminants generally will move vertically down through the soil column. (474:15 (Raviv)) A chemical's behavior below the water table, where the soil and water columns are equivalent, (2086:4 (Staples)), is controlled by its density. Low-density chemicals disperse and float in the groundwater, (2085:14 (Staples); DE056), while higher density substances migrate downward into the aquifer. (DE055)

79. PCBs exhibit stubborn characteristics. This group of contaminants adsorbs to soil particles, (460:6 (Raviv); 2084:2 (Staples)) and does not biodegrade. (2084:8 (Staples)) PCBs have very low water solubility, (464:20 (Raviv); 2084:1 (Staples)), but higher solubility in solvents. (2085:9 (Staples)) If released onto soil, PCBs will remain in place unless impacted by some external force. (2085:7 (Staples))

80. The BNs or phthalate ester products manufactured at the Hatco site have low densities, around .9, and tend to float on water. This characteristic enabled the parties to use skimming operations and oil-water separators to capture recyclable BNs contained in plant effluent. (2082:14, 2852:18–2853:22 (Staples)) Some BNs do not degrade easily in the environment, while others have some tendency to biodegrade. (2082:1–4 (Staples))

81. VOCs, as their name suggests, are more volatile than their sister organics, BNs. (2074:4 (Staples)) This category of chemicals moves through the soil column faster than PCBs. (460:20 (Raviv)) VOCs can solubilize PCBs, (464:22 (Raviv)), and, under the right circumstances, move them down through soils. (465:7 (Raviv))

82. The manufacturing activities at a plant site also contribute to the distribution of previously released contaminants. Events such as spills, leaks and drips and sewer and tank overflows can mobilize and rearrange chemicals in the environment.

83. Another important catalyst is surface water run-off generated by rainfall and other precipitation. Generally, this run-off will not contaminate subsurface soils. Contamination of the subsurface occurs when water dissolves contaminants at the surface before infiltrating downward through the soil column to the water table. Once dissolved, the contamination will travel with the water. (180:1 (Raviv))

84. With respect to BNs and PCBs, the short time period associated with run-off events is insufficient to dissolve these materials. (180:22, 181:6 (Raviv)) Although rain water percolates through BNs and PCBs, because these chemicals have low water solubilities, they do not infiltrate down to the water table. (230:16 (Raviv))

85. In contrast, water will dissolve and carry VOCs. (180:18 (Raviv)) When rainwater comes into contact with VOCs on the surface, it will dissolve a portion of the VOCs and move them to the water table. (460:24 (Raviv))

(2) PCB Contamination

86. The passage of time alone will not move PCBs. (2706:3 (Staples)) Generally, as a result, one would not expect PCBs to migrate to the subsurface soils or into the groundwater without decades or hundreds of years. (745:9 (Raviv))

87. PCBs can reach deep soils as a result of mechanical means or transport by another chemical. (2668:11 (Staples); 1089:10 (Trela) (spills of organics mobilize PCBs in physical and chemical sense))

88. Similarly, PCBs can reach the groundwater in one of three ways, specifically through: (1) physical introduction, (743:11 (Raviv)); (2) transport by VOCs, (743:23 (Raviv)); and (3) direct contact between the groundwater and PCB-soils. This third method, however, dissolves extremely low levels of PCBs into solution. (744:17 (Raviv))

89. The transport of PCBs is accomplished by chemicals in which PCBs solubilize. These chemicals carry PCBs downward as they migrate through the soil column to deeper soils and eventually to the water table. (2085:9 (Staples)) After reaching the water table, a low-density solvent will disperse and float on the surface of the groundwater, (2085:14 (Staples); DE056), while a solvent of higher density will continue to migrate downward into the aquifer. (DE055)

90. PCBs will remain in the solvent after it reaches the water table provided that the solvent is in substantial enough concentrations. At the edge of the solvent, however, PCBs will disperse into the water. (2086:17; 2107–2112 (Staples))

91. This solvent migration theory was used to explain the distribution of contaminants at the J.T. Baker site, a case with which both apportionment experts were familiar. There, DDT, a chemical that shares the low water solubility of PCBs, (468:2 (Raviv)), was found thirty-five feet from the surface in soils below the water table. A plume of chlorobenzene, a solvent with properties similar to those of TCA, (2104:9 (Staples); 468:8 (Raviv)), appeared in the groundwater downgradient from the DDT deposits, (469:23 (Raviv)), but only traces of chlorobenzene were found in the soil column with the DDT. (470:11, 476:12 (Raviv)) Both apportionment experts who testified in the instant case agreed that the chlorobenzene was the driving force that "allowed DDTs to migrate downward." (468:25, 471:5 (Raviv); 2105:7 (Staples))

92. Examples of VOCs present at the Hatco site that have the potential to cause the migration of PCBs include TCA, TCE, toluene and xylene. Toluene and xylene have densities less than one and therefor could not move PCBs down through the water table. TCA and TCE, in contrast, are heavier than water and capable of transporting PCBs to soils below the water table.

93. TCA and TCE degrade into similar chemicals. (2101:10 (Staples)) In fact, all TCA daughter products are also TCE daughter products. (2744:14 (Staples)) The primary daughter products of TCA are 1,1 DCA and monochloroethane (or chloroethane ("CA")), while the primary daughter product of TCE is 1,2 DCE. (2095:4 (Staples)) Daughter products help discern the identity of the parent chemical. (2101:19 (Staples))

94. The principal method by which TCA and TCE degrade in an aquifer is the removal of chlorine atoms, a process known as reductive dechlorination which produces DCA and DCE, respectively. (2824:11–23 (Staples); DE090)

95. Although TCE can degrade into DCA, the double-bonded carbons of the TCE molecule make degradation to DCA more difficult. (2824:24 (Staples)) The reductive dechlorination process which transforms TCE to DCE occurs almost thirty times more frequently than the degradation of TCE into other daughter products. (2825:17–21 (Staples))

96. Although the monitoring well data at the Fords facility indicates no exclusive TCA daughter products, but some exclusive TCE daughter products, (2765:13 (Staples); DE088), the relative concentrations of these chemicals indicate that the DCA and CA degraded from TCA not TCE. (2886:7 (Staples); DE088A)

97. TCA and its daughter products are found in substantial concentrations, while TCE and its specific daughter products are

not. (2828:5–19, 2874:25–2886:23 (Staples)) Most TCE and specific TCE daughter products appear in estimated concentrations below the testing laboratory's detection limit. (2827:13–23 (Staples))

98. Although a more detailed analysis of the TCA–PCB phenomenon is necessary before the Court can use this theory to explain the contamination at the Fords facility, this inquiry is better incorporated into the discussion pertaining to the areas in which defendant argued that the presence of TCA explained the PCB contamination.

#### c. Toxicity of Contaminants

99. Without a risk assessment, which details and determines the risk of exposure posed by chemicals detected at the Hatco site, the relative toxicity of chemicals detected at the Hatco site is not a relevant factor in dividing responsibility for contamination. (2265:22–2271:24 (Staples and the Court))

#### d. Remediation Costs

100. The cost of the disposal of contaminated material is controlled, in part, by whether it is classified as a hazardous waste as opposed to a hazardous substance. (969:17 (Trela)) This classification rests on the concentration and properties of the chemical as well as its source. (970:2, 963:18 (Trela))

101. Without the hazardous waste categorization the charge for removing VOC and BN contamination is \$50–\$150. PCB removal requires an expenditure of \$200–\$400 per ton at low concentration levels, \$400–\$1000 at medium levels and \$1000 if the concentrations reach the 500 ppm threshold. (965:2 (Trela))

102. Because the investigation and analysis of the contamination at the site is not complete, neither a risk assessment nor a remediation plan has been proposed or approved, and the ultimate remediation will not occur for several years, speculation as to remedial technologies or remediation costs appropriate to the site are premature and cannot be taken into account in an allocation of responsibility for the contamination at the site. (2258:18–22, 2259:12–22 (Staples))

#### e. Pre–1959 Manufacturing Activities

103. Due to the limited information about pre–1959 activities, (2173:21 (Staples)), and the increase in production of existing 1959 facilities, (522:25–23:24 (Raviv)), levels of Ester I production pre–1959 much lower than post–1959) as well as the construction of additional manufacturing plants which have dramatically changed the potential for impact to environment, (526:4 (Raviv)), the activities of the Hatco Chemical Company will not shape the apportionment decision of the Court.[10]

104. This result is consistent with the approach of both apportionment experts. (526:4 (Raviv); 2173:21 (Staples)) Neither expert offered an opinion regarding the level of contamination caused by the pre–1959 operation of the Fords facility. (526:14 (Raviv))

### F. Apportionment—Soil Contamination

105. The Court will follow the areas of environmental concern devised by plaintiff's expert. This site division has been incorporated into the remediation plans and reports previously submitted to the DEP. In addition, the numerous divisions offer a degree of detail that facilitates a complete discussion of the contamination at the Fords facility.

#### 1. Areas of Joint Use

#### a. Lagoons (AEC 1)

##### (1) Respective Uses

##### (a) Grace

106. Between 1959 and 1966, prior to the installation of the lagoons, effluent reached

10. Any resultant prejudice redounds to both Hatco and Grace since the manufacture of base neutrals dominated Hackman's operation of the site. Grace and Hatco continued the production of esters, and they share the responsibility for this contamination. This result also is consistent with CERCLA's strict liability approach. Because neither party has offered evidence regarding the proper share of liability of the Hatco Chemical Company, they bear the burden of this shortcoming. The right to seek contribution from the Hatco Chemical Company is available to remedy any unfairness.

off-site marshlands through unlined (391:11 (Raviv)) ditches (388:17 (Raviv)), one of which crossed the portion of the site that the west lagoon now occupies. (390:10 (Raviv))

107. Constructed in 1966, the two lagoons were installed atop clean fill with a man-made clay liner separating the lagoon bottoms from the underlying soils. (2203:6–12 (Staples)) Thereafter, Grace used the lagoons to drain the ponds. (380:11 (Raviv)) During this period, the lagoons received liquid waste from the pond system, (2203:6 (Staples)), and all chemicals discharged to the ponds reached the lagoons. (2414:10 (Staples)) Although Grace's skimming of the ponds, (670:2 (Raviv)), reduced the contamination in the liquid sent to the lagoons, (674:20 (Raviv)), contamination remained in the effluent because the pond skimming was not a constant operation. (830:1 (Raviv))

108. Following the pond elimination program in 1971, during which Grace installed by-pass piping around the lagoons, (2861:19 (Raviv); E368), Grace's effluent went directly from the sewers to the MCUA, and did not pass through the lagoons. As such, from 1971 to 1978 the lagoons were used only sporadically. (1318:5–12 (Reid); 2203:6 (Staples))

109. Grace did not skim the lagoons. (661:5 (Raviv) (no evidence of lagoon skimming at any time prior to 1984); Dominach Dep. at 472:3)

### (b) Hatco

110. Hatco skimmed the lagoons for a period of twelve months from May 4, 1984, (538:1 (Raviv); 2373:17 (Staples), E840) to April 18, 1985. (726:6 (Raviv); 2374:24 (Staples); E909, 892)

111. During the skimming project, Hatco closed the sewer line from the west lagoon to the MCUA, fitted the west lagoon with a boom, and skimmed product from the surface of the west lagoon. (401:20 (Raviv)) The line from the east lagoon to the MCUA remained active. (401:24 (Raviv))

112. Hatco pumped contaminated storm water run-off, (1752:10, 1755:1, 1842:19 (Chryss); E1070 Bates 002221), from the Ester I railroad swale area into the east lagoon, (681:5 (Raviv)), from 1985 to 1991. (1751:18 (Chryss))

113. Following the lagoon skimming project, Hatco used the lagoons on an "emergency" basis during periods of heavy rainfall as a retention basin for sewer overflows. (1382:4 (Chryss); E918)

114. Hatco took the lagoons out of service in 1991 and covered them with a plastic cap. (984:23–985:23 (Trela))

### (2) Contamination

115. DRAI conducted lagoon sampling in 1988. The capping of the lagoons made subsequent sampling impossible. (82:3 (Raviv))

116. The sludge layer above the clay liner of the west lagoon contains actionable 1,1–DCA and 1,1,1–TCA, actionable PCBs, specifically aroclor 1248, and actionable DEHP, BBP, DBP and DOP.[11]

117. The sludge layer above the clay liner of the east lagoon contains actionable BZ and 1,1–DCA, actionable PCBs, specifically aroclor 1248, and actionable DEHP, BBP, DBP and DOP.

118. The soils below the clay liner in the west lagoon contain actionable 1,1–DCA and 1,1,1–TCA, actionable PCBs, specifically aroclor 1248, and actionable DEHP, BBP, DBP and DOP.

119. The soils below the clay liner in the east lagoon contain actionable PCBs, specifically aroclor 1248, and actionable DEHP, BBP, DBP and Naph, but no actionable VOCs.

120. The PCB and BN contamination in the east and west lagoons both above and below the clay liner is similar. The same menu of contaminants appears at similar orders of magnitude. (412:20, 24, 413:20 (Raviv); 2219:4 (Staples))

121. Although the east and west lagoons above the clay liner both contain 1,1–DCA and 1,1,1–TCA, the orders of magnitude differ across lagoons. In the east lagoon the

11. Unless otherwise indicated, references to the presence and concentrations of contaminants in the soils are drawn from the data reported in Volume II of E2487 and reports of groundwater data originate from Volume I of E2487.

results for DCA range from 1.6 to 4.2 ppm and for TCA from 1.4 to 8.2 ppm. In the west lagoon the values for DCA range from 5.7 to 180 ppm and for TCA from 12 to 3600 ppm.

122. No DCA or TCA was detected below the clay liner in the east lagoon. Below the clay liner in the west lagoon, from zero to one-half of a foot, DCA and TCA were found in concentrations of 320 and 430 ppm, respectively. Between 0.5 to 2 feet, however, these values drop off dramatically to 0.03 ppm and nondetect ("ND") for DCA and 0.1 and 0.01 ppm for TCA.

123. The groundwater in this area contains TCA and its daughter products. Sampling from monitoring well 6S, located south of the east lagoon recorded: an initial 1,1,1–TCA value of 120 ppb in April 1988 that decreased steadily to ND in April 1992; 1,1–DCA at a concentration of 1100 ppb in April 1988 that decreased steadily to 54 ppb in April 1992; the first appearance of chloroethane in October 1988 at a level of 15 ppb that increased steadily to 91 ppm in April 1991 and then dropped to 68 ppb by April 1992. Located south of the west lagoon, monitoring well 7S never has tested positive for 1,1,1–TCA, but contained 1,1–DCA at values of 74 ppb in April 1988 which decreased steadily to ND by April 1992. Chloroethane first appeared in monitoring well 7S in October 1988 and increased to 330 ppb by April 1991 before dropping to 250 ppb on April 1992.

### (3) Apportionment of Lagoons

124. The location of PCBs below the clay liner of the lagoons was a problem for which Dr. Raviv had no ready explanation at the time of his deposition. (736:2 (Raviv)) The similarity in the BN and PCB contamination across the lagoons, as well as the finding of aroclor 1248 at a depth of 4.5 feet in the east lagoon, (731:19 (Raviv)), defeats the theory offered at trial that the pre–1971 ditch that traversed the area in which the west lagoon is now located caused the PCB contamination below the lagoon liner. (730:24 (Raviv))

125. It is clear, however, that some external mechanism is required to mobilize PCBs. PCBs in a liquid form will migrate vertically with a driving force. (733:20 (Raviv)) The introduction of large volumes of effluent creates an hydraulic head that mobilizes contamination in the lagoons downward. (666:14–667:1 (Raviv)) Alternatively, PCBs mixed with BNs or other liquids can migrate vertically. (732:17, 733:11 (Raviv))

126. The data indicates the presence of TCA and its daughter products in both monitoring wells 6S and 7S. Due to the site's south-southwest groundwater flow, as depicted on demonstrative exhibit 33, the VOC contamination found in monitoring well 6S, located east of the west lagoon, did not originate from the west lagoon. As a result, the east lagoon is the source of the TCA found within well 6S.

127. Time of use, exclusive use of contaminants and the migratory properties of PCBs guide the apportionment of responsibility for contamination in the lagoons area.

128. Based on exclusive use, the PCBs within the soil above the liner in the east and west lagoons will be assigned 100% to Grace. Similarly, the TCA and TCA daughter products found above and below the clay liner in the west lagoon will be assigned 100% to Hatco.

129. VOC contamination in the soils above the clay liner in the east lagoon, which results from both Grace and Hatco chemicals, will be divided between the parties according to time of use as will the BN contamination throughout the lagoons.

130. PCB contamination in the soils below the clay liner in the east and west lagoons also will be divided among the parties according to time of use. During their respective periods of lagoon use, both Hatco and Grace created the enhanced conditions needed for PCB movement. The introduction of BNs and VOCs to the lagoon area as well as the physical effects of introducing large-volumes of liquid into the lagoons mobilized the PCBs in the sludge and caused them to reach depths below the clay liner.[12]

12. God, not science, has the ability to determine whether only one of these two phenomena is the sole culprit. Both explanations, however, sup-

131. The time of use factor accounts for periods of full use and partial use. Full use is measured according to the number of years during which the lagoons received plant effluent. (620:10 (Raviv)) Partial use, designed to quantify the impact to the environment of storm water accumulation, sewer overflows and temporary run-off, (622:22 (Raviv); 2210:11 (Staples)), is the equivalent of two days of full use each month.[13] (620:10 (Raviv))

132. Grace's full use of the lagoons spanned 4.25 years while its partial use of the lagoons continued seven more years. Hatco's full use filled one year, and its partial use lasted for eleven years. As such, Grace is responsible for 73.2% of the VOC contamination in the east lagoon,[14] the PCB contamination below the clay liner and the BN contamination, and Hatco is responsible for 26.8% of the VOC contamination in the east lagoon, the PCB contamination below the clay liner and the BN contamination.

**b. Former Ponds Area (AEC 2)**

**(1) Respective Uses**

**(a) Grace**

133. From 1959 to 1971, Grace operated a settling pond system, to which Grace discharged all plant effluent and from which Grace periodically removed semi-solid muck. *See* ¶¶ 32–35 *supra.*

134. By 1962, this system consisted of four unlined ponds which were created by digging large holes in the earth. (Stipulation No. 59; DE003; DE005; Napack Aff. ¶ 6) Effluent from manufacturing processes went directly into ponds one and two. Ester material floating on top of these ponds was removed, and the waste water then went to pond number three. The main waste water pond, pond three, was skimmed periodically, and the skimmed material was pumped to pond one for reclamation. Pond four also was used for waste water storage. (Napack Aff. ¶ 7)

135. Until 1966, this waste water was discharged off-site through unlined trenches. (DE002; 35:23–36:2 (Raviv); Napack Dep. at 275:11–24) Thereafter, skimmed pond effluent flowed to the lagoons. (Stipulation No. 22)

136. As of 1970, the dimensions of the ponds were as follows: (a) pond one measured 85 feet by 50 feet; (b) pond two was 75 feet by 45 feet; (c) pond three reached 90 feet by 95 feet; and (d) irregularly-shaped pond four was slightly larger than 90 feet by 90 feet. (E363 at H501626) The ponds and muck areas themselves occupied only a fraction of the ponds region depicted in AEC 2. (2671:21 (Staples))

137. By early 1971, Grace had eliminated the ponds. To accomplish this reclamation, Grace first dug diversionary trenching in the earth throughout the pond area. Used for pond drainage, these trenches carried effluent from the ponds to the sewage authority via the lagoons. (Dominach Dep. at 190:14–91:13)

138. The ponds were then excavated. The "oil-laden earth" removed was easily identified by its black color. (273:12 (Raviv); 2223:11 (Staples)) Engineering plans estimated excavation depths from two to six feet. (E338 at H516540; 277:8 (Raviv) (two, three and six feet scenarios measure depth of excavation, not depth from surface)) Photographs taken during the pond elimination program indicate that Grace excavated pond two to roughly twelve to fifteen feet below the surface. (1115:22–1116:11 (Trela))

port the choice of time-of-use as the apportionment sword.

13. Both experts agreed that partial use impacted the environment, though at a greatly reduced rate. (623:9 (Raviv); 2211:12, 2872:24 (Staples)) Raviv initially assumed that partial use had one-tenth the impact of full use. (621:18 (Raviv)) If one year of partial use had one-tenth of the impact of one year of full use, then annual partial use would equal 36.5 days of full use. By adopting Staples's assumption that one month of partial use equals two days of full use, the Court follows the more conservative route.

14. The absence of actionable TCA or its daughter products below the clay liner of the east lagoon is not significant due to their presence in the sludge of the east lagoon and their absence from deeper soils below the clay liner of the west lagoon. (2892:11 (Staples))

139. The water table in the area of the former ponds, allowing for seasonal variations, ranges from near the surface to ten feet below the surface. (274:17–20, 278:13–22 (Raviv)) In the portion of the area formerly occupied by ponds one and two, the depth to water measures between six or eight to ten feet below the surface. (278:13–18 (Raviv)) In the area south of former ponds one and two, the water table moves closer to the surface, finally reaching the surface in the area just north of the lagoons. (278:19–22 (Raviv))

140. To fill the areas of excavation, Grace brought clean soil from the Ester II area, (267:12 (Raviv)), and mixed it with contaminated soil located between and around the ponds. (272:6 (Raviv) (data indicates this)) Grace also used the contaminated dike walls from the muck storage area as fill material. (269:14 (Raviv); 2223:11; 2676:10–2681:14 (Staples) (corroborating use of contaminated dike walls))

141. Grace's pond elimination program did not remove from the Fords site all of the contamination from the former ponds area, (263:22, 267:5 (Raviv)), as the distribution and depth of PCBs in the former ponds and muck storage areas indicate. (267:7 (Raviv)) One estimate indicated that Grace removed eighty-three percent of the contaminated soil during its program. (2229:15 (Staples))

142. The remaining pond residue material is not distributed evenly throughout the pond region. This material is readily identified in the data where very high PCB concentrations are found. (2233:3 (Staples))

### (b) Hatco

143. Plaintiff Hatco constructed the EPT plant in 1990 in the center of the pond region where former pond four was located. (566:11–22 (Raviv)) This plant functions as oil-water separator, (712:16 (Raviv)), removing any dissolved, suspended or floating organic chemicals from the water. (931:1 (Trela)) It does not produce an effluent. (2306:15 (Staples))

144. Plaintiff Hatco also operates a portion of the ZAA facility and storage in the former ponds area. (2222:4 (Staples))

### (2) Contamination

145. The former ponds area is home to widespread BN, PCB and VOC contamination in the surface and subsurface. Actionable BNs found in the surface soils include DEHP, BBP, DEP, DBP, DOP and Naph. The DEHP appears throughout the area, while the remaining BNs are clustered near the locations of the former ponds.

146. Actionable PCBs are spread over the surface of the entire central portion of the area. Data indicates the presence of both aroclor 1248 and aroclor 1254.

147. The VOC contamination is more isolated with actionable BZ, TCE and xylene detected in the surface soils.

148. In the subsurface soils a broader menu of BNs are spread more widely across the area. BNs remain at actionable levels to depths of ten to eleven feet across the site and at fourteen feet within former pond two. The highest concentrations of BNs appear in the former ponds and muck storage areas.

149. Extensive subsurface PCB testing measured actionable readings from two to twenty-one feet. At two to five feet, aroclor 1248 dominates the results with only two actionable findings of aroclor 1254, one each in pond two and pond three. At this depth, concentrations crossed the thousand ppm mark near pond three and the muck area. At five to seven feet, the high concentrations continue south of pond two and in and south of the muck area. From seven to eleven feet, pond two soils contain PCBs at levels greater than one thousand ppm, while concentrations in other portions of the area have declined. At twelve to fourteen feet in pond two concentrations measure 250–400 ppm.

150. In the subsurface, within the VOC category, actionable BZ appears at points throughout the area, one sample on the edge of pond three contained actionable toluene, actionable TCE was found in four samples, three in pond two and one in pond three, and lastly xylene turned up twice south of the ZAA facility and once at a depth of fourteen feet in former pond two.

### (3) Apportionment

151. Because of the different impacts on portions of the site and the distinguishing behavior of the categories of chemicals, the ponds region is best apportioned by examining the surface and subsurface soils separately. Here, the types of use and the migratory potential guide the Court's liability assignment.

152. Grace's operation of the settling pond system and its implementation of the pond elimination program largely contributed to the contamination in the surface and subsurface soils of the former ponds area.

153. The demucking operations introduced PCBs, BNs and VOCs to the soils below water table. (2569:9 (Staples); 1102:18–1105:7 (Trela) (describing chemicals contained in pond muck)) Generally, the depth of PCBs contamination correlates with the depths of the ponds. (277:2 (Raviv)) PCBs reached this depth because of the operation of the ponds. (278:4 (Raviv))

154. The pond-area-wide regrading spread contaminants across the surface of the area, (272:6 (Raviv)), as did the use of cranes and dump trucks for the pond excavation, (1105:16–1108:14 (Trela)) and the drainage trenches. (1109:3–12 (Trela))

155. Sewer backups and overflows and surface water runoff also contributed to the contamination of the surface areas of the ponds region. (2243:13 (Staples)) These events moved and redeposited existing surface contamination, (178:16–22 (Raviv)), and brought additional contamination from other areas of the plant, including the Ester I building and the Ester I tank farm, to the ponds area. (163:20–164:5 (Raviv)) Such incidents also incited the movement of VOCs to the subsurface soils.[15] *See* ¶¶ 83–85 *supra.*

156. Grace will be responsible for 100% of the BNs and PCBs found in the subsurface soils of the former ponds area.[16] The pond elimination program provided the mechanical means of placing these substances in the deep soils.

157. This result is not inconsistent with the conclusion in the lagoons area, where there was evidence of TCA in the groundwater where the PCBs were found in the soils.

158. Grace also will be fully accountable for the surface PCB contamination. Because of the physical properties of PCBs, it is unlikely that subsequent periodic impacts to the surface soils redistributed PCBs.

159. In contrast, because surface events contributed to the BN and VOC contamination found in the former ponds area in the surface soils as well as the VOC contamination in the subsurface soils, time of use will guide the allocation of these BNs and VOCs. Following the full and partial use formula used in the lagoon area, Grace will receive 93.1% and Hatco will receive 6.9%[17] of the actionable surface BN contamination and surface and subsurface VOC contamination.[18]

15. Consistent with the expert opinions offered at trial, the Court assumes that following the pond elimination program "any kind of run-off and so forth was the same under Grace as it is under Hatco." (179:4 (Raviv) (assumed number of releases same pre- and post–78); 2244:5 (Staples)

16. There is contamination deeper than the indicated depths of the ponds, however, (176:3–10 (Raviv)), that Grace's operations in this region cannot explain. This migration of contaminants into the deeper soils resulted from the interface between the bottoms of the ponds and the water table, (2629:11 (Staples)), as well as the leaking of chemicals from the bottom of the ponds. (2602:4 (Staples) (all chemicals released into ponds leaked from bottom; although some chemicals less dense than water, all dissolved to some degree within water column and filter materials captured organics and settled))

Because the finding of deeper than expected PCBs in ponds one and two located north of the ZAA facility is not accompanied by evidence of TCA or TCA daughter products in the groundwater, the solvent-induced migration thesis is inadequate. Even the proponent of this theory was unable to conclude with certainty that the TCA caused the chemical migration in this area. (2667:6, 2244:16 (Staples))

17. These percentages are derived from Grace's full use for twelve years from 1959 to 1971 and partial use for seven and one half years from March 1971 to August 1978, and Hatco's partial use for fourteen years from 1979 to 1992, again equating one month of partial use with two days of full use.

18. This allocation result also guides the inquiry in AEC 21A, Crow's Mill Creek. Located on the western boundary of the Fords property, this stream drains AEC 2.

### c. Ester I Complex (AEC4)

#### (1) Respective Uses

160. During the past thirty-three years, both Grace and Hatco have manufactured similar products and generated similar waste in the Ester I facility. (186:25 (Raviv)) Throughout this period, Ester I operated without periods of closure. (185:20–24 (Raviv))

161. One important exception to this characterization is the use of PCBs. Between 1961 and 1966, Grace used aroclor 1248 in the hydrotherm units located in the Ester I area. (186:18 (Raviv))

162. Grace's operation of the hydrotherm units was extremely problematic. (1042:15–24 (Trela)) In addition to startup troubles, oil leaks, and fires, Grace was plagued by a series of coking problems that clogged the system and required frequent fluid changes. (1043:11–16, 1059:19–1060:15 (Trela))

163. From 1959 to 1971 the drainage facilities in the Ester I complex to capture runoff and spillage remained the same. (515:4 (Raviv)) In 1967, Grace installed an underground sewer system that was connected to the lagoons and the MCUA. (513:21 (Raviv)) The sewer hookup took place physically outside the Ester I complex. (513:24 (Raviv))

164. During the post–1978 period, Hatco stored tens of thousands of pounds of TCA bottoms in the Ester I area. (739:17–740:14 (Raviv); E933; DE039) Hatco also manufactured PXE here.

#### (2) Contamination

165. Of four VOC surface samples, one sample contained actionable xylene in the northwest corner of the area adjacent to the Ester I tank farm. Actionable xylene and BZ both were found in subsurface VOC samples.

166. Numerous subsurface BN samples yielded actionable DEHP and DEP in the Ester I railroad tank farm. No actionable BN contamination was detected in the subsurface soils in this area.

167. Surface PCB testing revealed three samples of actionable aroclor 1248, one each in the railroad tank farm, the hydrotherm building and the southwest portion of the area. Limited subsurface PCB sampling revealed actionable PCBs at four feet in the hydrotherm building and in monitoring well 15S.

#### (3) Apportionment

168. Contributing to the contamination in the Ester I area were spills, leaks, drips, and trench overflows. (E1690; 2175:15–23, 2903:2 (Staples)) Releases of contaminants also resulted from boilouts and breakdowns of the kettle reactors of Ester I and the hydrotherm units, (2175:17 (Staples)), and the process of draining and replacing the fluid in the hydrotherm system. (1060:8–20 (Trela))

169. Based on the parties' similar uses of this portion of the site, the BN and VOC contamination found in the Ester I area will be assigned based on time of use. As such, Grace will receive 57.6% for its nineteen years of use and Hatco will receive 42.4% for its fourteen years of operation.

170. The presence or absence of sewers at the site does not alter this allocation. The existence of sewers has little impact on the Ester I complex. Sewers did not serve most of the area and drainage trenches were in place throughout Grace's ownership. (2174:16 (Staples))

171. Moreover, whether spills and leaks within the Ester I complex traveled through trenches to the ponds or through trenches to the sewers to the ponds, the impact of runoff and spillage is better allocated within the former ponds region. Any other approach raises the specter of double-counting.

172. Grace will receive full responsibility for the PCB contamination in the Ester I area based on its use of aroclors in the hydrotherm units. Aroclor 1248 contamination occurs in proximity to the hydrotherm units in Ester I. (1065:1–2 (Trela))

### d. Ester II (AEC 5)

#### (1) Respective Uses

173. Ester II was built in 1971. (Napack Dep. (1–29–90) at 43:14) The resultant increase in ester production capacity raised the volume of esters produced at Grace from 26 million pounds in the first quarter of 1970 to

39 million pounds in the first quarter of 1971. (Memorandum from Alex Kaufman to J. Peter Grace, Jr. (April 27, 1971), E405 at WRGO8198 (contradicting 1239:21 (Reid testimony that Ester II went on line in 1972))

174. Before construction, Ester II had a projected production capacity of 150 million pounds per year. (E324 at WRG 13222; see also 1240:5 (Reid) (daily production of DOP "close to a half a million pounds")) Based on the production rates Kaufman reported, reiterated above, the initial annual Ester II production was 52 million pounds. At the time it ceased operations in 1979, Ester II was producing DOP at a rate of approximately 140 million pounds per year. (Donnelly Stipulation, ¶ 25)

175. Hatco operated the Ester II plant from 1978 to 1979, when the supply of raw materials was exhausted. (E722 (Ester II not operating in April 1980); Stipulation No. 8, ¶ 7 (DIDP was not produced at Ester II plant between 1980 and 1986)) Hatco reactivated the Ester II plant in 1987 with a production rate of ten million pounds a year which eventually grew to the current rate of 100 million pounds a year. (1450:20 (Chryss))

176. In addition, from 1979 to 1987 for a period of 14 years Hatco distilled PXE in Ester II. In 1988, for a period of twelve days, Hatco hydrolyzed TCA bottoms in Ester II. (Maimon, ¶ 34, E1404)

177. In 1987, Hatco relocated Tank 908B to the northwestern quarter of the Ester II area for use in the oil-water separator system. (2177:21, 2178:10 (Staples)) Previously, Tank 908B had been used during the lagoon skimming project to receive skimmings. (2906:17 (Staples)) Following its relocation to Ester II, PCB–liquid was detected in Tank 908B. (2906:21 (Staples))

178. In July 1989, Hatco's environmental manager classified the Tank 908 system as an area in urgent need of a spill control plan based on "recent spill history and overall chemical hazard." (2907:22 (Staples); E1565 at H030823, 030827)

#### (2) Contamination

179. No actionable VOC contamination has been detected within the Ester II area. Actionable BNs, specifically DEHP, have been detected in the surface and subsurface of the Ester II area. PCB concentrations in excess of action levels have been detected in the surface of this area, but not in the subsurface.

#### (3) Apportionment

180. Due to the introduction of Tank 908B to the Ester II area and the PCBs found in the M tanks area located upgradient from Ester II, the PCB contamination will be assigned fully to Hatco.

181. BNs will be allocated based on annual production rates multiplied by years of use. Grace operated the Ester II plant from 1971 to 1978 for a period of seven and one half years, producing 52 million pounds of product in the first year and 140 million pounds thereafter for a total of 962 million pounds. During its seven years of operation, Hatco's Ester II production totaled 650 million pounds, with 140 million pounds produced from 1978–79, 10 million pounds created in 1987, the first year back on line, and 100 million pounds for each of the remaining five years. Based on these production rates, Grace will receive 59.7% for BNs and Hatco will receive 40.3%.

### e. RR Sidings and Swale (AEC 3)

#### (1) Respective Uses

182. This area contains two railroad sidings, the siding that serves Ester I which has been in operation for thirty-three years, and the siding that serves Ester II which has been in operation for roughly fifteen years.

183. Years of use of the railroad swale area mirror the periods during which the respective facilities were operating. (2185:9 (Staples))

184. Grace used the Ester I railroad siding for nineteen years, and Hatco used the Ester I railroad siding for fourteen years.

185. Grace used the Ester II railroad siding for 7.5 years, and Hatco used the Ester II railroad siding for seven years.

#### (2) Contamination

186. This area contains no actionable VOC contamination in the surface or subsur-

face soils. Actionable BNs and PCBs appear in isolated areas of the site at the surface and subsurface.

(3) **Apportionment**

187. Sources of BN and VOC contamination include the movement of raw materials and products to and from the Hatco site and the storage of hazardous waste tanks. (2184:3 (Staples)) The PCB contamination in this area originated from the Ester I complex and the hydrotherm units located upgradient from the swale area. (184:23 (Raviv))

188. Because Grace used PCBs in the Ester I complex, it will receive full responsibility for the PCB contamination within this area.

189. The BN contamination is best apportioned based on time of use. Grace's combined years of Ester I and II use equals 26.5 years while Hatco's figure is twenty-one years. As a result, Grace will receive 55.8% and Hatco will receive 44.2% of the BN contamination in the swales.

190. A time-based apportionment for BN contamination is appropriate because the railroad sidings generally were used in the same fashion pre- and post-1978, with both parties bringing in the same loads of the same type of chemicals at similar frequencies. (183:20–184:8 (Raviv))

**f. Ester I Tank Farm (AEC 9A)**

**(1) Respective Uses**

191. Used to store raw materials, products and waste, the Ester I tank farm has been in existence throughout the parties' combined thirty-three years of ownership. (2192:3–10 (Staples))

192. Grace stored Hatcol 27 and other off-color plasticizer in the Ester I tank farm. (1065:2–5 (Trela); Boyd Stipulation ¶ 4(b), (c)) Grace used aroclor 1254 in the manufacture of off-color plasticizer. (1078:11–18 (Trela))

193. The 204 series tanks are located in the Ester I tank farm. (2193:10 (Staples)) This oil-water separator served the main processing unit throughout most of the pre- and post-1978 periods. (2193:10–21 (Staples))

**(2) Contamination**

194. Widespread actionable BN contamination is detected in the surface soils in the Ester I tank farm. DEHP appears most frequently, but BBP, DEP, DBP and DOP also were found. With DEHP, BBP, DEP and DBP in the subsurface soils, the menu of actionable BNs is similar although it appears less frequently.

195. Actionable PCBs are found in the surface and subsurface soils in this area. Both aroclor 1248 and 1254 were detected. The PCB concentrations are relatively low, reaching a high of 19 ppm in the surface and 13 ppm in the subsurface.

196. Xylene was the one actionable VOC detected in the surface soils of this area. In the subsurface, xylene again was detected at actionable levels along with BZ and TCE.

**(3) Apportionment**

197. The contamination in this area was caused by spills and releases from the various tanks during loading and unloading and leaking valves. (2193:5 (Staples)) Post-1978 there were numerous spills and leaks around the 204 series tanks. (E1490, 1468, 1565 at H030824, A030827, 1732 (204 series operating in April 1990))

198. The series 204 tanks contain PCBs that originated from the operation of the hydrotherm units, lagoon skimmings [19] and the sewer system material, all of which passed through the separator system. (2193:24 (Staples)) Although the precise date on which PCBs were introduced to this oil-water separator is uncertain, (2194:23 (Staples)), 1961, which marks Grace's first use of aroclors, is an acceptable estimate. Similarly, Hatco's activities could not have contributed to the PCBs in the 204 series tanks until after 1984, the year the lagoon skimming project began.

19. Hatco stored lagoon skimmings in Tank 732 located in the Ester I area. (2901:18–2902:5 (Staples)) The sampling data indicates that 1991 PCBs levels at the Ester I complex were higher than those found in 1988, thereby suggesting that a spill occurred during the interim. (738:2 (Raviv)) Also, in September 1988, Tank 11, located in the Ester I railroad tank farm, was determined to contain materials contaminated with PCBs. (Grassmyer Dep. 580:12–82; E1332)

199. Grace's use of aroclors in the molecular and capryl stills from 1961 to 1966 impacted this area. (194:24–195:17 (Raviv); 1065:19–1066:20 (Trela)) In addition, Grace's storage of OCP introduced aroclor 1254 to the Ester I tank farm. (1076:19–1078:18 (Trela))

200. Consistent with the allocation in the Ester I complex, time of use is an appropriate means of allocating responsibility for the BN and VOC contamination in the Ester I tank farm. (195:12 (Raviv)) Grace's nineteen years of use and Hatco's fourteen-year long operation, yield 57.6% for Grace and 42.4% for Hatco for BNs and VOCs.

201. For the reasons expressed above, the sewer factor does not alter the BN and VOC allocation.

202. As the primary source of aroclors in this area, Grace will receive 100% responsibility for PCBs in the subsurface soils. Through the 204 series tanks, however, both Grace and Hatco introduced PCBs to the surface soils of the Ester I tank farm. Classifying Grace's aroclor use as full use and the operation of the oil-separator system as partial use, responsibility for surface-soil PCB contamination will be divided with 94.9% to Grace and 5.1% to Hatco.[20]

### g. Naphthalene (M) Tanks (AEC 9C)

#### (1) Respective Uses

203. During the operation of the PA plants from 1961 to 1971, Grace stored naphthalene in the M tanks. (2544:5 (Staples))

204. Hatco stored lagoon skimmings in the M Tanks. (205:15 (Raviv)) The lagoon skimming operation began in 1984, and the resultant PCB–liquids remained onsite until 1988. (E1332)

205. Hatco stored one million pounds of PXE residue in the M–tanks, specifically M1B and M1C. (1389:10 (Chryss); E950; 693:13 (Raviv))

#### (2) Contamination

206. Actionable BNs including DEHP, Naph and DBP were found in the surface soils. In the subsurface, one sample yielded a DEHP concentration in excess of its action level.

207. PCBs, primarily aroclor 1248, were detected throughout the area in the surface soils. While actionable, the concentrations were relatively low with the 18 ppm the highest reading. Subsurface PCB testing yielded nondetects or concentrations below action levels.

208. The surface soils were not tested for VOCs. Subsurface VOC sampling yielded no concentrations in excess of action levels.

#### (3) Apportionment

209. Because Hatco's activity introduced PCBs to the M–tank area, where previously there was no PCB contamination (529:19 (Raviv)), Hatco is responsible for 100% of the PCB contamination found in the surface soils in this area.[21]

210. Because both Grace and Hatco introduced BNs to the M tanks, Grace through naphthalene storage, (2545:21 (Staples)), and Hatco through lagoon skimmings storage, (2544:5 (Staples)), BNs will be apportioned based on time of use. Based on a ten-year Grace period and a five-year Hatco term, Grace will receive 66.7% and Hatco will receive 33.3% for the BN contamination in this area.

### h. ZAA Complex (AEC 19)

#### (1) Respective Uses

211. Grace manufactured benzyl chloride in this area, using quantities of toluene in the process.

20. Grace provided PCB source material to the Ester I tank farm area during five years of full use and seventeen years of partial use. From 1985, following its reactivation of the 204 series tanks, until 1990 when the EPT plant went on line, Hatco contributed to the PCB problem during five years of partial use. Based on the spill records relating to the 204 tank series, an assumption of two spills a month is reasonable. (E1468 (reporting two such spills within single week)) As such, annual partial use again will equal twenty-four days each year.

21. This liability assignment arises from Hatco's poor operation and maintenance record in the M tank area. (531:4 (Raviv)) For this reason, Hatco also will receive 100% of the contamination found in the area of the transformers. (AEC 12) (150:16 (Raviv))

212. During its ownership, Hatco has operated the ZAA facility in this area. From September 1983 to October 1990, Hatco used TCA in the ZAA process. Benzyl chloride is a by-product of the manufacture of ZAA.

(2) **Contamination**

213. Actionable BNs and PCBs were detected in the surface soils. Four samples contained DEHP with values ranging from 140 to 1500 ppm, while two samples revealed aroclor 1248 and one held a combination of aroclor 1248 and 1254. No surface samples were tested for VOCs.

214. All categories of contamination appear in the subsurface soils. Again, the BN contamination consisted of DEHP. Two samples contained PCBs, specifically aroclor 1248, at low concentrations of 3.2 and 3.9 ppm. Of the VOCs, actionable concentrations of TCA and DCA were found at a depth of six feet.

(3) **Apportionment**

215. The parties' respective uses guide the allocation of responsibility. In this area, the nature as well as the time of use are determinative.

216. As the sole TCA source in this area, Hatco will be assigned 100% responsibility for actionable TCA and its daughter products. (152:1 (Raviv))

217. Similarly, because Grace used toluene in its manufacturing activities in this area, it will retain 100% responsibility for any toluene contamination.[22]

218. Neither party supplied a direct source of BNs or PCBs in this area. Because the ZAA area is located downgradient of the Ester I building, it is reasonable to conclude that the Ester I building is the indirect source of the BN and PCB contamination detected in the soils in this area. (*See* ¶ 187, *supra* (source of contamination in railroad swale area upgradient manufacturing area)) As such, the BN and PCB allocation in the ZAA area will mirror the Ester I complex percentages, *see* ¶¶ 169–172 *supra*, with Grace receiving 100% of the PCBs and 57.6% of the BNs and VOCs and Hatco receiving 42.4% of the BNs and VOCs.

(i) **Sewers (AEC 22)**

219. Although the sewer system is home to PCBs and other chemicals, it is not treated like other areas of joint use. There is no direct correlation between the location of the sewers and the contaminated soils. Rather, the contamination found adjacent to the sewer lines can be traced to other activities. (331:14–332:17 (Raviv)) These problem soils already have been included in the overall volumes of impacted soils. (332:1–4 (Raviv))

220. Waste water and sewage sludge can escape to surrounding soils from imperfections in sewer lines located above the water table. (922:16–923:8 (Trela)) Recent inspection of the Hatco sewers, however, revealed that they were in good condition with only a few locations requiring small repairs. (923:15–23 (Trela))

2. **Hot Spots**

221. Areas that are clean with the exception of isolated contamination have been designated "hot spots." These portions of the site are located to the northwest and southeast of all historical and existing manufacturing activities. These areas include the Tarry Area (AEC 8) and the Southeast Fill Area (AEC 13) to the southeast and the Alcohol Tank Farm (AEC 9B), the Scales Tank Farm (AEC 9D) and Pilot Plant II (AEC 18B) to the northwest.

222. The hot spots reasonably can be linked to the transport and storage of chemicals at the site. The hot spots found in the southeast region are found in or immediately adjacent to internal paved roadways. In the northwest the hot spots are located in and around tanks.

223. Where, as here, the handling of chemicals had the determinative role in caus-

22. Grace and Hatco both introduced benzyl chloride to this area of the site. TCA bottoms, produced in the manufacture of TCA, are one-third benzyl chloride. (E836) In addition, Hatco produced 51,300 pounds of benzyl chloride at the Fords site in 1989. (587:24 (Raviv); E1780 Bates A300779) Based on this information, Hatco's expert questioned his decision to apportion 100% of the benzyl-chloride-related chemicals to Grace. (594:6 (Raviv)) Nevertheless, this revision does not alter Grace's responsibility for toluene contamination. (597:11 (Raviv)

ing contamination, the identity of the chemicals will guide the apportionment decision. PCBs, introduced to the site by Grace, will be apportioned 100% to Grace. BNs, utilized by both parties, will be apportioned based on time of use, yielding 57.6% for Grace and 42.4% for Hatco.

### 3. Areas of Exclusive Use

224. Grace alone utilized certain portions of the site, including AECs 6, 7A, 14, 10B and 17. (154:23–155:13 (Raviv))

225. These areas will be apportioned 100% to Grace because, historically, that area of the site was used only prior to 1978. This area includes the PA Process Area, the PA Residue Area and the Naphthalene Area. (2133:23–2134:12 (Staples); DE059 (area marked "4"))

226. In addition, the actionable BNs and PCBs found in Sling Tail Creek (AEC 21B) resulted from drainage of the drum storage and K024 areas, which only Grace used. (154:14 (Raviv))

### 4. Uncontaminated and Untested Areas

227. Sampling conducted in the remaining portions of the site has detected no actionable contamination. The clean areas include the No. 6 Fuel Oil Tank Area (AEC 9E), the Current Drum and Waste Storage Area (AEC 10A), the Underground Storage Tank (AEC 11A), the Salt UST Area (AEC 11B), the Research and Development Laboratory (AEC 16), the Clean Fill Area (AEC 17), (134:3 (Raviv)), Pilot Plant I (AEC 18A), (134:12 (Raviv)), and the area east of Sling Tail Creek (AEC 20). (134:15 (Raviv)) (DE059) (areas marked "1", "2", "3"; 2131:9–2133:21 (Staples))

228. In the No. 6 Fuel Oil Tank Area, the single sampling location measured BNs and PCBs at the surface and subsurface, but revealed no actionable contamination.

229. No sampling was conducted within the Current Drum and Waste Storage Area.

230. The Underground Storage Tank sampling included surface and subsurface testing for BNs and VOCs. Surface samples contained no actionable contamination. Subsurface samples were non-detect for VOCs and non-detect or not actionable for BNs.

231. No sampling was conducted within the Salt UST Area.

232. The numerous surface samples in the Research and Development Laboratory area revealed no actionable BNs and non-detect or non-actionable PCBs. At the subsurface BNs were not actionable and PCBs were non-detect. The only VOC sample was taken from the subsurface and was not actionable.

233. In the Clean Fill Area, the BNs detected at the surface and subsurface were not actionable. The PCBs samples from the surface soils were non-detect or non-actionable, while all subsurface PCB samples were non-detect. The only VOC samples came from the subsurface soils, and they were not actionable.

234. Widespread BN and PCB sampling in the surface soils of the Pilot Plant I area yielded levels of contamination that are not actionable. The one surface VOC sample also was not actionable. Subsurface samples for all three categories of contaminants were non-detect or non-actionable.

235. Only surface samples were pulled from the soils in the area east of Sling Tail Creek. VOC and PCB tests yielded non-detects while the BN samples were not actionable.

## G. Apportionment—Sitewide Groundwater Contamination

### 1. Delineation

236. The first monitoring wells ("MW") at the Fords facility date back to 1982. By 1992, the installation of additional wells raised their number to twenty-eight.

237. The DEP determined the location of some of the monitoring wells, while DRAI chose the remaining sites based on the area of environmental concern division. (214:18, 215:1 (Raviv)) Three wells were placed north of any industrial operation to determine the natural water conditions at the site. (212:13 (Raviv)) Since 1986, DRAI has conducted quarterly groundwater sampling. (415:16–25 (Raviv))

238. The monitoring wells were dug above and below the natural clay layer. This system of shallow and deep wells allows the measurement of the quality of the shallow and deep groundwater. (214:9 (Raviv))

239. Once in place, the monitoring wells are used to measure the levels of the water table, to determine the direction of the groundwater flow and to detect contamination. The combination of this information allows the definition of the groundwater contamination plume. (210–211 (Raviv)) A plume represents a continuum of contamination. (224:23 (Raviv))

### 2. Contamination

240. Initial contamination estimates showed that the groundwater at the Hatco site included 97.2% BNs, 0.2% PCBs and 2.6% VOCs. (E2458) Based on October 1992 sampling, (436:12 (Raviv)), the targeted contamination is comprised of 82.9% BNs, 1.2% PCBs and 15.9% VOCs. (435:1 (Raviv))

241. The groundwater contamination is concentrated in the areas of manufacturing and waste disposal activities. (232:10 (Raviv)) As one travels further from the groundwater plume, the data indicates the presence of less subsurface contamination. (232:10 (Raviv); DE023)

242. Generally, rather than plumes, the deep aquifer contains only spot contamination. (224:24 (Raviv)) The deep aquifer is not impacted with VOCs with the exception of the area immediately adjacent to former pond one. (224:2 (Raviv))

243. The shallow aquifer contains BNs, PCBs and VOCs. (DE036, 037) The menu of chemicals varies across the different monitoring wells. (223:5 (Raviv))

244. Data indicates numerous plumes within the shallow aquifer. The type and concentration of contamination varies between each plume, (222:16–223:11 (Raviv)), preventing their connection into one sitewide plume. (223:5 (Raviv))

245. The DEP adopted and promulgated groundwater regulations. (226:9 (Raviv)) The PCB limit is zero, making an ND the only acceptable result, (226:21 (Raviv)), while actionable BN levels range from single to double digits. (226:24 (Raviv))

246. Plumes of VOC contamination include: plumes of 6000, 3000, 1000 and 100 ppb around MW17S, located southeast of the ZAA facility; plumes of 200 and 100 ppb around MW1S located east of the east lagoon; plumes of 200 and 100 ppb around MW7S located south of the west lagoon; a plume of 100 ppb around MW22s, located southwest of warehouse number four; a plume of 3000 ppb around MW19S which is encircled by a plume of 1000 ppb that also includes MW16s with both wells located south of the Ester I tank farm in the area of former ponds one and two; plumes of 20,000, 3000 and 1000 around MW15S, located in the Ester I area. A larger plume of 100 ppb encloses MW15S, 16S and 19S. Excluding Ester II the entire region of manufacturing activity is marked by a plume of 10 ppb.

247. BN and PCB groundwater contamination is less wide-spread. The highest concentrations of these two categories appear in MW15S with BNs at 171,000 ppb and PCBs at 24,000 ppb. In the former ponds one and two area, MW19S contains 880 ppb BNs and 810 ppb PCBs, while the adjacent MW16S holds 120 ppb BNs and 974 ppb PCBs. MW17S located north of the former muck storage area contains 3279 ppb BNs and 510 ppb PCBs. To the southeast the readings in MW10S are 225 ppb BNs and 41 ppb PCBs. Plumes encircle MW15S, MW19S and MW16S, MW17S and MW17S and MW10S. Moving south toward the lagoons, samples were non-detect for BNs and PCBs, with only MW5S east of the railroad sidings containing BNs at 1 ppb.

248. Monitoring Well 15S contains a NAPL layer made up of PCBs, xylenes and phthalates. (236:6; 244:2 (Raviv); 1182:2 (Trela)) Almost one foot thick, this black layer resembles oil, (245:2 (Raviv)), and floats on top of the water. (244:14 (Raviv))

249. Monitoring Well 17S, located north of the former muck storage area, also contains xylene. (749:16 (Raviv)) The order of magnitude of the xylene concentrations differs across wells 15S and 17S. It is much greater in well 15S. (753:8 (Raviv)) In addition, well 17S contains three additional com-

pounds not found in Well 15S, specifically TCA, 1,1–DCA and chloroethane, both daughter products of TCA. (752:6; 753:21 (Raviv)) The TCA in well 17S is present in significant concentrations. (581:5 (Raviv))

250. Groundwater data from wells in the former ponds region indicates that there are areas where PCB–contaminated soils are in direct contact with the water table. (276:19 (Raviv)) Despite their low water solubility, given enough time, if PCBs are in constant contact with the water table, some PCBs will enter water table. (277:21; 278:13–280:4 (Raviv) (examples of deep PCB findings at or below water table from DE016/17))

### 3. Apportionment

251. A variety of occurrences contribute to groundwater contamination including spills and percolating run-off. (234:1 (Raviv)) In addition, groundwater is dynamic; as it flows it comes in contact with various contaminated soils. Thus, time of use offers the best approach to the apportionment of groundwater contamination. (435:6 (Raviv))

252. Where relevant, however, a party's exclusive use or fate and transport properties may provide a better means to apportion certain chemicals. (755:24 (Raviv))

253. Accordingly, BNs and VOCs will be divided 57.6% to Grace and 42.4% to Hatco based on time of use, with exceptions for VOCs used exclusively by Hatco such as xylene and TCA. For example, the xylene in well 15S will be assigned to Hatco. Hatco used xylene in PXE production, and the xylene in monitoring well 15S is along the xylene route between Ester I and Ester II. (234:16 (Raviv))

254. With one exception, PCBs in the groundwater will be awarded 100% to Grace. Prior to 1971, Grace deposited the PCBs in soils just above the water table and below the water table. (233:9 (Raviv)) Anywhere that the ponds penetrated the water table or the bottoms of the ponds were near the water table, a direct impact to the groundwater resulted. (275:15 (Raviv))

255. The exception to the PCB apportionment involves the PCBs found in the NAPL layer in monitoring well 15S. These PCBs will be the responsibility of Hatco. Upon contact with the PCB–soils, the xylene leached the PCBs from the soil—bringing them from a solid to a liquid phase—into solution in the free product layer. (242:3, 747:25, 748:20 (Raviv))

## H. Apportionment—Contribution Factors

256. Grace seeks contribution from Hatco based on equitable considerations. Prior to trial, the Court examined the equitable factors suggested by the parties and, based on the events of the instant case, named six equitable factors that would guide its evaluation of Grace's claim for contribution under section 113. These factors include: (1) the knowledge Kaufman acquired during his Grace employment and his acquiescence in contaminating activities following Hatco's purchase of the site; (2) the degree of care exercised by the parties, taking into account the relevant statutes and regulations; (3) the degree of cooperation with federal, state and local officials exhibited by the parties to prevent harm to public health or the environment, without regard to periods of ownership; (4) any financial benefit to the parties arising from remediation; (5) the extent to which Hatco undertook reasonable efforts to mitigate the environmental damage; and (6) any benefits the parties received from the activities that lead to the environmental damage.

### 1. Knowledge of Kaufman

257. Alex Kaufman ("Kaufman") is the president and sole shareholder of Hatco. As the sole shareholder, Kaufman receives any and all dividends the company pays. (1785:22 (Chryss))

258. In resolving the statute of limitations issue Grace raised to defeat Hatco's strict liability claim, the Court found that Kaufman had "extensive knowledge of waste disposal practices at the site" and an "intimate familiarity with the day-to-day operations of the site developed over two decades." *Hatco Corp. v. W.R. Grace & Co.–Conn.*, 801 F.Supp. 1309, 1324 (D.N.J.1992). Kaufman's knowledge and management of the site also is a factor that is relevant to the section 113

contribution inquiry. (*See* May 13, 1993 Memorandum Opinion and Order at 4)

259. Trained in chemistry but not engineering, (1872:17–25, 1879:10–11 (Kaufman)), Kaufman began what was to be his career-long association with Hatco in the 1950s as a laboratory dishwasher. (1875:12–1876:3 (Kaufman))

260. Before succeeding William Hackman as the President of the Hatco Chemical Division in 1962, Kaufman served as a laborer, a laboratory technician and chemist and the Ester I plant manager. (Stipulation No. 84; 1876:13–1877:13 (Kaufman)) These jobs took Kaufman to the Ester I plant and the research and development laboratory, (1879:4–8 Kaufman)), where he was responsible for process development and improvements in manufacturing processes. (Stipulation No. 83; 1879:4–8 (Kaufman))

261. During this period Kaufman developed the process to make sebacic acid at the Hatco facility. (1878:9–18 (Kaufman)) Later, he also recommended the installation of the benzyl chloride plant. (1888:20–1889:18 (Kaufman)) In the 1960s, Kaufman and other management personnel determined which laboratory projects were "scaled up" from the pilot lab at the Hatco site into full production. (R. Miller Dep. 115:18–16:14)

262. As plant manager Kaufman also was familiar with the waste disposal practices at the facility. (2001:17–2004:14, 2004:21–2005:2 (Kaufman); Hackman Dep. 210:20–211:13; Ackelsberg Dep. 151:18–53:14) In particular, he knew that the ponds were used to separate and recover useable organic material, (1881:20–24 (Kaufman)), although he had no role in their design or construction. (1881:17–19, 1897:13–18 (Kaufman))

263. In 1960, Alex Kaufman hired Dr. David Fine, an engineering professor, to investigate and provide recommendations concerning the Hatco Chemical Division's waste disposal practices. (E35) Dr. Fine submitted his report on the Hatco Chemical Division's waste water disposal practices to Kaufman in August 1960. The report describes, among other things, the operation and suggested improvements for the pond recovery system in use at the Hatco Chemical Division at that time. (E36, 37)

264. With the presidency in 1962 came new duties, as Kaufman assumed responsibility for the profit and loss of the Hatco Chemical Division. (1898:14–1899:18 (Kaufman)) He then hired additional people to assist in running the business. (1899:20–1900:20 (Kaufman))

265. With his academic and employment background, Kaufman enjoyed a detailed understanding of the chemical processes used at the Fords facility. (1998:22–2000:18 (Kaufman)) Within the Grace organization, Kaufman was respected for his extensive knowledge of organic chemistry, and among the group executives, probably had the greatest know-how and experience in organic chemistry. (Robbins Stip., ¶ 2D; Grace Dep. 224:24–26:18)

266. Grace management put this expertise to use, instructing Kaufman to expand the business. (1902:9–13 (Kaufman)) In keeping with the directive he had received from Grace management, Kaufman began to acquire companies on behalf of Grace. (1909:13–19 (Kaufman)) Expansion of the business for Grace became Kaufman's primary focus. (1902:3–8 (Kaufman))

267. The acquisition program required much of Kaufman's time. (Grace Dep. 254:9–23) In addition to the acquisitions that were completed, Kaufman devoted time to potential acquisitions that were not consummated. (1922:2–7 (Kaufman)) He became preoccupied with acquisitions and with the administration of the newly-acquired businesses. (1205:6–16 (Reid))

268. Indeed, by August 1964, Grace management recognized that the acquisition program Kaufman was pursuing "will require more of Alex Kaufman's time and more delegation of responsibility." (E152) Kaufman in fact delegated responsibility. (1913:8–1914:2 (Kaufman))

269. Kaufman's duties in the 1960s required substantial travel, including trips to Europe, the Far East and Mexico. (1932:3–10 (Kaufman); Robbins Dep. 263) In 1962, Mr. Kaufman spent a high percentage of his time at the Fords facility, but as time went

on, he spent less time there. (1994:12–19 (Kaufman); Roth Dep. 187:14–188:19)

270. As a result, the day-to-day operation of the Fords facility fell to other employees. John Gutai was responsible for the plant from 1962 to 1964. (1201:6–19 (Reid)) Kaufman later hired Oscar Ackelsberg, who joined the Hatco Chemical Division as Vice President of Operations in February 1964 and took over responsibility for plant operations. (1900:12–20 (Kaufman); E637 at WRG15908) He remained in charge of the daily operations at the Fords plant until about 1969 when Hugo Biertuempfel assumed this post. During the 1970s, George Napack was general manager of the plant. (1965:25–1965:4, 1966:24–1977:3 (Kaufman)) The Hatco Chemical Division also staffed an engineering department in the 1960s. (1901:5–7 (Kaufman))

271. By November 1968, the Hatco Group included businesses in eight different industries: ticking and upholstery fabrics, footwear, women's wear, vinyl products, chemical products, polyesters, office supplies and equipment and resale products. (E308 at WRG078642)

272. In all, Mr. Kaufman arranged the following acquisitions on behalf of Grace:

| Company | Acquisition Date |
|---|---|
| Howards & Sons | February 1964 |
| Elm Coated Fabrics | July 1964 |
| Marco Chemical | March 1965 |
| Southern Resins | June 1965 |
| Southbridge Plast. | June 1965 |
| Ellay Rubber Products | March 1966 |
| Joshua Meier | October 1967 |
| Golding Bros. | April 1968 |
| Consol. Intl. Trading (CTIC) | July 1968 |
| Letisse, Inc. | August 1969 |
| Pix of America | December 1969 |
| Futura Footwear | January 1970 |
| Bekaert | January 1970 |
| Herman's Sporting Goods | May 1970 |
| Lawrence Maid Footwear & Superior Shoe Co. | May 1970 |

(Kaufman Stipulation, ¶ 1)

273. Once the acquisition program was completed, the resultant group of companies continued to demand much of Kaufman's time. Kaufman had supervisory responsibility over the various businesses in the Hatco Group, (McNair Dep. 41:6–42:6), and his responsibilities during the period that Grace owned and operated the Fords facility for seeing that those companies ran and for seeing that they were integrated into Grace were very substantial. (1951:16–52:1 (stipulation by counsel for Grace))

274. Grace had an extensive reporting system. (1903:14–24 (Kaufman)) Every group or division head prepared a one-year budget, a five-year budget, and a ten-year plan for each business and product line in which the group or division was engaged. (1923:5–11 (Kaufman)) With the acquisition of each new business, Mr. Kaufman became responsible for providing business reports to Grace. (1911:15–24, 1916:5–22–1916:15 (Kaufman))

275. The reporting responsibilities to Grace for the many businesses Mr. Kaufman was in charge of took a tremendous amount of time. (Kunze Dep. 25:22–27:2) About forty percent of top management's time was devoted to reporting to Grace. (Kunze Dep. 27:6–11)

276. In addition, Kaufman spent a great deal of time learning the new businesses and dealing with the executives of the various businesses that were acquired, many of whom were upset by the decline in value of Grace stock, which they had received in exchange for their companies, and required considerable attention. (1925:5–1926:11 (Kaufman))

277. As a result, during the 1970s Kaufman was not involved in the day-to-day operations of any of the divisions of the Hatco Group. (Donnelly Stipulation, ¶ 14 (addressing 1974 to 1976)) Thus, although Mr. Kaufman was President of the Hatco Chemical Division, he did not take a particularly active part in running it. (Napack Dep. 24) With his office located in a building at the northern boundary of the Fords site (DEC02), he very seldom ventured into the plants. (1901:17–1902:6 (Kaufman)) Instead, during the 1960s and 1970s, he relied on key personnel such as George Napack, Oscar Ackelsberg, Thomas Boyd, Martin Roth and Dr. Donald Denny to keep him apprised of the

activities and operations of the plant. (Ackelsberg Dep. 460; Boyd Dep. 51, 112–113; Roth Dep. 157–58, 179; Denny Dep. 20–22, 28)

278. From 1962 to 1978, however, he was the ultimate decision maker on significant matters relating to the various divisions of the Hatco Group, including the Hatco Chemical Division. (1996:1–22 (Kaufman)) Kaufman required the heads of the various operating divisions of the Hatco Group to keep him informed of any significant environmental problems. (2014:16–18 (Kaufman); R. Miller Dep. 252–54)

279. As President of the Hatco Chemical Division, Kaufman was concerned about what was going on environmentally in the 1970s at the Hatco facility. (2025:24–2026:4 (Kaufman)) He regularly was informed of any contacts with governmental agencies on environmental matters, (2014:19–2015:1 (Kaufman)), any other alleged environmental problems and its pollution control expenditures. (2011:14–2014:18, 2025:19–23 (Kaufman); E262, 272, 302) Between August 1973 and April 1978, Kaufman received numerous monthly environmental reports, reflecting whether or not the Hatco Chemical Division had been involved in any governmental proceedings involving the enforcement of environmental laws. (1964:1–16 (Kaufman))

280. After Kaufman purchased the Hatco facility in 1978, most of the senior executives that had worked for him at the Hatco Chemical Division, including George Napack and Harry Reid, stayed on and worked for Kaufman at the Hatco Corporation. (2047:24–2048:20 (Kaufman)) Thus, Kaufman and the management of Hatco after the 1978 acquisition were intimately familiar with all of the activities at the Fords facility prior to the sale. Kaufman acknowledged his expertise in the sale agreement. (E671 § 8.01 (acknowledging that "Buyers are expert in the plasticizer and synthetic lubricant business"))

281. As of 1978, Kaufman also was aware of the increasing concern of governmental agencies regarding the environmental consequences of past and present chemical manufacturing activities. (2027:6, 2028:3 (Kaufman); E432) Kaufman was kept advised of impending environmental regulations in the 1970s, including federal statutes such as the Toxic Substances Control Act. (2029:20–2031:1 (Kaufman); E596) Indeed, Kaufman understood as of the 1970's that whoever owned and ran the Hatco facility would, to an increasing extent, have to be concerned about environmental regulations. (2027:24–2028:3 (Kaufman))

## 2. Degree of Care

282. A party who acts in accordance with applicable environmental standards and who is unaware of the potential for harm from its actions is less deserving of responsibility for the costs of remediation than a party who acts in willful disregard of known environmental standards, statutes and risks. (533:3–23 (Raviv)) Accordingly, whether each party exercised due care in its management of the site is a factor that must be considered in determining their equitable contributions to the remediation of the site. (May 13, 1993 Memorandum Opinion and Order, at 6)

283. PCBs were first detected at the Hatco site in 1981, following DEP soil, liquid and leachate sampling in various locations throughout the site in July of that year.[23] (E771 at WRG02118) Test results revealed aroclor 1248 in concentrations of 18, 28.9 and 40.3 ppm. (E720, 771 These PCB readings were below the regulatory limit of 50 ppm in effect at the time. (877:18 (Trela)) The Amended Administrative Order issued to Hatco by the DEP shortly thereafter highlighted benzene, xylene, toluene and phthalate findings, but not the PCB detections. (E771 at WRG 02117 ¶¶ 5, 6 and 8, WRG 02118 ¶¶ 9 and 10)

284. Despite the fact that George Napack ("Napack"), Hatco's then-Senior Vice President and General Manager, had headed the PA plants, an area of stipulated aroclor use, (Stipulation No. 38), he reacted with disbelief

23. Based on E720, the parties assigned a date of March 1980 to the initial PCB findings. This date reflects only the lagoon sampling reported on E720 at Environ 01494–01495. The remaining pages of E720 are duplicates of E761 pages H700252 to H700265. E761 is dated October 26, 1981.

to the DEP's early findings. (1231:5–1233:11 (Reid))

285. On or before March 26, 1985, George Chryss ("Chryss") learned that samples taken from the lagoon sludge in January 1985 had tested positive for PCBs in excess of then-current PCB action levels. (1668:2–1671:18 (Chryss); E871, 888) On or about March 27, 1985, Hatco learned that the rerun of the PCB test on the lagoon sludge sample confirmed the previous results. (E890) Around this time, Chryss triggered an investigation into the presence and use of aroclors at the Hatco facility (1671:1–14 (Chryss); E886, 889) and ordered another round of tests. (1672:7–9 (Chryss))

286. At least as early as 1982, while Chryss was employed by Burmah-Castrol, he knew that aroclors contained PCBs and understood that the presence of PCBs would pose a substantial concern for any industrial facility. (1626:19–1628:16 (Chryss))

287. On April 2, 1985, after PCBs had been detected in the lagoons, Chryss met with Kaufman and Napack to discuss the use and presence of PCBs at the Hatco site. (1675:20–1677:16, 1834:23–1835:18 (Chryss)) At this meeting, Napack told Chryss that he did not believe that PCBs ever had been used at the Fords site. (1677:13–20 (Chryss)) During this conversation, nobody advised Chryss that previous testing at the site in 1981 had detected the presence of PCBs at several locations.[24] (1677:21–1678:5 (Chryss))

288. On April 3, 1985, Chryss received documents establishing that aroclors were used at the plant in the 1960s. (1678:11–16 (Chryss); E900; 1521:6–18 (Hatco counsel clarifying contents of document for record))

289. Although these documents referenced the Monsanto Company, Hatco never contacted Monsanto at or about this time to determine whether Hatco ever purchased aroclors from Monsanto. (1678:17–1679:3 (Chryss)) Although the issue of PCB use at the Hatco site remained unresolved, (1678:7–10 (Chryss)), Hatco did not conduct any further inquiry.[25] (1683:18–1684:5 (Chryss))

290. On or about April 5, 1985, Hatco received the retest results from a sample taken from the west lagoon. The report indicated the presence of PCBs at a level of 194 ppm in the lagoon sludge. (1672:10–1673:15 (Chryss); E903 at H500367)

291. Despite these additional test results, raising the number of reports of actionable PCBs to three, Hatco management refused to conclude that PCBs had been at the site. (1679:4–1681:4 (Chryss)) Napack rejected the test results due to the interference of phthalate esters with PCB testing (1679:8–13 (Chryss)), but Hatco did not attempt more accurate studies.

292. Although Hatco also was aware at this time that hundreds of thousands of pounds of skimmed material had been recovered out of the PCB-contaminated lagoons and stored in various tanks at the site, throughout the remainder of 1985, Hatco did not undertake any effort to determine whether or not the lagoon skimmings were contaminated with PCBs. (1688:10–1690:9 (Chryss))

293. By April 1986, Hatco had grown anxious about the volume of organic waste stored at the Fords facility and the resultant complication of its permit process. (E992) Faced with the urgent need to convert or dispose of these organics, Hatco tested the stored materials. (E992, E991) Test results dated April 23, 1986 indicated the presence

24. Although Chryss was informed about the environmental problems at the site in interviews before being hired in 1984, he was neither given a copy of the 1981 Administrative Consent Order nor told about the 1980 and 1981 PCB findings. (1630:12–1634:12 (Chryss)) Indeed, prior to 1988, no one at Hatco advised Chryss that the 1981 ACO reflected that PCBs had been found in soil samples taken at the Hatco site in 1981. (1634:13–1635:6, 1788:12–20 (Chryss))

25. As of this date, numerous documents existed at Hatco not only confirming the use of aroclors at the site, but detailing the location and amounts purchased and used. In addition, there were at the site in 1985 several longtime employees who had been involved with the use of aroclors in the 1960's, and who could have told management, had they been asked, about that use.

Indeed, in the course of Hatco's 1988 investigation, Hatco employees detailed the locations, including the molecular still, the hydrotherms, and the capryl still, where PCBs were used in the 1960's. (1172:19–1173:2 (Trela))

of PCBs in Tank 7000C (also referred to as "M1A" in concentrations of 91 and 100 ppm. (E999, 1000) Test results dated September 12, 1986 indicated the presence of PCBs in Tank M1A in concentrations of 86 and 97 ppm and in Tank M1B between 97 and 147 ppm. (E1037)

294. By October 1986, Hatco began investigating possible off-site disposal facilities for the incineration of Hatco's surplus by-products. (E1042, 1044 and 1048) In November 1986, one such plant in Cementon, New York, returned a shipment of surplus organics to Hatco due to their high PCB content. (E1051, 1053)

295. After PCBs were detected in the M tanks, Hatco did not test other tanks for PCBs or test the soil around the M tanks for possible PCB contamination. (Ho Dep. 183:4–15) Hatco stored lagoon skimmings at the site until 1988. (E1332)

296. In November 1990, Hatco began operating an effluent pretreatment plant. The purpose of the EPT plant was to comply with the MCUA-mandated effluent permit requirements, effective November 5, 1990, which at that time included standards for total petroleum hydrocarbons (related to organic content of effluent) and ph control. (Mustacchio Stip. ¶ 16)

297. Hatco considered several locations for the EPT facility, taking into account factors such as distance from the convergence of the main sewer lines, truck access, degree of soil contamination, future land use and cost-effectiveness. (*Id.* ¶ 17) The site selected for the EPT plant was as far north as economically feasible given the Hatco sewer line configuration. (*Id.* ¶ 18)

298. Chryss chose the location for the EPT plant after hearing and evaluating recommendations concerning alternative locations. (1532:7–22 (Chryss)) At the time he made this decision, he did not believe that location was in an area where there were high concentrations of PCBs. He relied on a drawing Andrew Soos, Hatco's environmental manager, presented to him that showed the proposed EPT plant site between former ponds two and four. (1532:23–1535:13 (Chryss)) The precise proposed site was immediately adjacent to, and even slightly overlapped, former pond four. (E1631 at H030943) Chryss did recognize, however, that the facility would be installed over a contaminated area. (1780:16–23 (Chryss))

299. Hatco constructed the EPT plant without excavating soil underneath it. Hatco justified its failure to remediate the area before laying the EPT foundation by claiming that it did not have the financial resources to remediate or properly dispose of any soil. (1777:25–1781:3 (Chryss))

300. DRAI informed Hatco prior to the construction of the EPT plant that the center of the ponds area was not the best location for the plant. Hatco constructed the plant there anyway based on cost and flow efficiency considerations. (567:1–568:7 (Raviv))

301. The location of the EPT will complicate remediation in that area to the extent that excavation of the underlying soils becomes necessary. (1779:3–18 (Chryss))

302. From 1985 to 1991, Hatco pumped accumulated surface water run-off from the railroad swales into the lagoons and used the lagoons to capture sewer overflows.

303. During his 1987 site inspection for Exxon, Robert Marmara described the swales as heavily contaminated earthen ditches. (E1136 at Exxon 04909–04911) Hatco itself knew the swales were contaminated. (1750:22–1752:10 (Chryss); E916, 918, 919)

304. Hatco's environmental and legal personnel cautioned against this form of lagoon use. As early as 1985, plant manager Larry Rotter recommended that Hatco establish "as a priority project" a system that eliminated such pumping. (1751:6–1752:2 (Chryss); E918, 919) In April 1986, Hatco's attorneys advised Hatco that if the lagoons were contaminated there was "absolutely no way that [the lagoons] can be used even for emergencies." (1764:1–1765:9 (Chryss); E990) Finally, in 1989, Soos advised Chryss that directing the Ester II swale discharge to the lagoons was not in good faith compliance with Hatco's NJDPES permit. (1754:24–1758:8 (Chryss)) Still, Hatco continued the pumping until 1991.

305. Despite its awareness that the lagoons were contaminated and contributing to

groundwater contamination, Hatco originally contemplated the use of the lagoons to store excavated soil generated from the construction of the EPT plant. (Mustacchio Stip., ¶ 21) The DEP rejected this proposed use of the lagoons. (*Id.*, ¶ 23)

**3. Cooperation with Government Officials**

**a. Grace**

306. In December 1962, the State Department of Health (the "Department") ordered Grace to cease its discharge of industrial waste to the Raritan River by April 1963. (E82) By this date, Grace had met with state officials and hired a waste water consultant to sample its sludge and effluent in order to determine the best way of addressing the problem. (E89, 90, 91) Grace kept the state apprised of these efforts and the Department agreed to take no further action pursuant to the cease and desist order. (E93, 96, 97, 99, 109, 155, 130, 131)

307. In December 1963, the Department asked Grace to provide a commitment to remedy the effluent problem by March 1964, advising Grace to connect their property to the MCSA. (E96, 117) Following a September 1963 meeting with the MCSA and the receipt of its consultant's report, (E110, 114), Grace submitted a request for the funds needed to complete the sewer hook-up, receiving approval by February 1964. (E129, 130)

308. Growing impatient when the project remained incomplete in May 1966, the Department advised Grace that it would have to treat its effluent onsite before release if Grace did not tie in to the municipal sewer. (E218) Grace completed the MCSA connection in November 1966. (E232) Legal difficulties involved in obtaining the necessary easements from local officials and a high water table had impeded construction. (E219, 232) State officials acknowledged Grace's efforts and expressed their appreciation. (E131, 289)

309. In May 1967, the Army Corp of Engineers called Grace's attention to the problems caused by their effluent streams that remained unconnected to MCSA. (E254, 263) This effluent was discharged through three unlined ditches that flowed into Sling Tail Creek, (E254, and Crow's Mill Creek; E263, 270 at WRG01860) Grace diverted a portion of the effluent streams to its ponds, (E261, 281) (same document), and by November 24, 1967 all three ditches were tied into the MCSA. (E261, 281, 290 at H513896)

310. Grace recognized in April 1968 that closure of the ponds would be necessary. (E294) The pond elimination program was completed in early 1971. (E393) During the pond excavation, monthly progress reports concerning the project were sent to the state. (*See e.g.*, E343, 345, 348, 349, 356, 363, 364)

311. No state, local or federal governmental authority sought to involve Grace in the remediation of the Hatco site until April 1992. (E2201; Conway Dep. 59:22–60:5) At this time, the DEP informed Grace that Grace would have the opportunity to sign the draft ACO that had been negotiated during the previous six months between Hatco and the DEP. (E2193, 2201)

312. In April, May and June 1992, Grace advised the DEP that it could not unilaterally sign the proposed ACO due to concerns about site access and compliance stemming from Hatco's possession of the site. (E2221, Conway Dep. 59:22–62:17)

313. On August 5, 1992, the DEP issued a joint Directive to Hatco and Grace. Grace submitted a timely response to the DEP, but did not sign the ACO. (E2342)

**b. Hatco**

314. In July 1979, the DEP visited Hatco to investigate oil discovered in Crows Mill Creek. (1216:1–1217:19 (Reid); E696) Shortly thereafter, Hatco set out to remedy deficiencies DEP officials noted during their visit. (1218:1–1219:12 (Reid); E698) During a return visit in August 1979, Hatco showed DEP its improvements. (1219:20–1221:13 (Reid); E699)

315. In October 1979, DEP wrote Hatco and directed it to undertake a pollution abatement program during the course of which Hatco would remove contaminated soil

from the lagoons and other areas of the site and install monitoring wells.[26] (E704)

316. Hatco engaged counsel to evaluate the statutory basis for the DEP's demands and hired an environmental consultant to verify the DEP's determinations with respect to the lagoons. (E709, 717) After an exchange of correspondence and information about the site, Hatco advised the DEP in April 1980 that it was prepared to submit a full proposal to the DEP based on the advice of its environmental consultant. (E723)

317. On June 16, 1981, based upon visual site inspections, (E733, ¶ 2), and test results that revealed lagoon contamination, (E720), the DEP issued an Administrative Order to Hatco which directed that Hatco perform soil borings, install monitoring wells, cease groundwater pollution and remove contaminated soils from the site. (E737) In response, Hatco ordered sampling from the lagoons to confirm the DEP findings and requested an administrative hearing. (E742, 739)

318. Following additional sampling, (E744), and site inspections, (E757), the DEP issued an Amended Administrative Order. After negotiations, the DEP and Hatco agreed that Hatco would investigate the environmental contamination at the site. This agreement was reflected in an Administrative Consent Order signed on September 28, 1982. (E784) Pursuant to its terms, Hatco agreed to install seven groundwater monitoring wells and sample the wells periodically during the next five years. (E784) Hatco complied with these terms. (864:11–24 (Trela))

319. In April 1983, Hatco applied for a NJPDES permit, seeking authorization for its then sporadic use of the lagoons. (1237:13–1238:11 (Reid); E792) On November 26, 1984, Hatco sought information regarding a temporary permit authorizing the lagoon skimming project that was instituted in April 1984. (E859) Hatco submitted a formal request for the temporary permit on December 5, 1984. (E857, 858)

320. In response to Hatco's application for a special permit, the DEP required testing of the lagoons. (E862) Results of the January 16, 1985 sampling, E870, received on March 4, 1985, revealed the presence of aroclor 1248 in the lagoon sludge. (E881) By April 8, 1985, Hatco had developed a preliminary program to shut down the lagoon skimming operation. (E892, 904)

321. During an April 3, 1985 telephone conversation, the DEP instructed Hatco to discontinue discharging effluent to the lagoons. (E905) This order was repeated in writing on April 15, 1985. (*Id.*) Hatco closed the effluent line to the lagoons on April 18, 1985. (1379:2–18 (Chryss); E910)

322. On December 16, 1985, the DEP issued a draft New Jersey Pollutant Discharge Elimination Permit ("NJPDES permit") to Hatco that required Hatco to submit to the Department a plan for the closure of the lagoons. (E959 at H501648)

323. Negotiations between Hatco and the DEP followed. (1422:5–1424:1 (Chryss)) The parties met on February 7, 1986 and February 25, 1986. (1425:18–1437:13 (Chryss); E971, 977) After several extensions were granted, (E975, 978), Hatco submitted its comments on the draft permit on March 20, 1986. (E984) Around this time, Hatco's environmental expert, DRAI, began sampling work at the site. (1447:23–1448:24 (Chryss); Stipulation Nos. 42, 44)

324. The DEP issued the final NJPDES permit on April 22, 1987. (E1070) Negotiations between the parties continued through September, (1454:9–14, 1460:7–21 (Chryss); E1091), and DRAI prepared a proposed work plan which was submitted to the DEP. (1457:9–1458:1 (Chryss); E1083, 1087) By November 1987, Hatco began work in order to meet the minimum regulatory requirements set out in the permit. (E1125, 1188) In January 1988, the parties met to discuss Hatco's progress toward compliance and to set up a timetable for completion. (1480:12–25 (Chryss); E1158)

325. By letter dated December 14, 1987 Hatco informed the DEP of Hatco's under-

26. Apparent miscommunication caused the DEP to characterize this instruction as an agreement. Reid had no recollection of consenting to such terms. (1226:5–1227:5 (Reid))

standing that the requested remediation and closure plans would await results of the sampling program currently underway. (E1137 at H505636) By letter dated February 26, 1988, the DEP agreed with minor modifications. (E1182)

326. Hatco kept the DEP apprised of its progress with the site investigation. (E1196) Negotiations and modifications in the compliance schedule continued until May 1989, (1519:20–15:20–1 (Chryss); 1488), when a proposed compliance schedule was issued. (E1517)

327. By the spring of 1991, Hatco recognized the need for an ACO to complete the site remediation. (1561:16–1562:18 (Chryss)) The first draft ACO, issued on October 30, 1991, called for a Remedial Investigation/Feasibility Study ("RI/FS") and implementation of a remedial action plan to clean up the contamination at the Hatco site. (E2109) After receiving an extension, Hatco responded to the DEP proposal on December 9, 1991. (E2128) Negotiations continued until March 1992 when Hatco received a final revised draft ACO. (1567:1–18 (Chryss); E2187)

328. On August 5, 1992 the DEP issued a Directive to Hatco and Grace. (E2262, 2264) Within thirty days, they were to arrange for the cessation of the environmental threat. (E2262 at A215317, ¶ 29) Hatco filed its draft RI work plan with the DEP on August 26, 1992, and signed the ACO on September 9, 1992. (E2348)

329. Pursuant to the ACO Hatco has completed a remedial investigation and a scoping report and investigation, which included a remedial investigation work plan, field work and a final report. (1140:22–1141:18 (Trela))

### 4. Financial Benefit of Remediation

330. The financial benefit derived from remediation is a factor that must be considered in determining the equitable contribution of each party to the remediation of the site. (May 13, 1993 Memorandum Opinion and Order at 8–9)

331. In 1978, Kaufman-controlled corporations purchased the Fords facility from Grace for approximately $5.5 million after adjustments. Grace fixed the price. It was not negotiated. (1967:10–18 (Kaufman))

332. Grace's sale of the Fords facility to Kaufman followed a three-year effort of Kaufman himself and others to divest the entire group of Hatco businesses. (Kunze Dep. at 31:13–32:9; Robbins Dep. at 281:8–282:7) When these efforts proved unsuccessful (1960:25–1963:10 (Kaufman); Kunze Dep. 31:15–20), Grace decided to sell individual businesses in the Hatco Group. (Kunze Dep. 47:18–25)

333. Initial efforts to sell the Fords operation to U.S. Steel, ICI, Badische and a Canadian company failed. (Kunze Dep. 48:17–49:23; Robbins Dep. 288:17–22)

334. At the time of the 1978 sale, the Hatco Chemical Division was facing the loss of its supply of oxo-alcohol, a critical raw material in the production of DOP in the Ester II plant. (1967:20–24 (Kaufman); Grace Dep. 280:16–281:10, 284:18–285:23) That prospect created a tremendous business risk. (1967:25–1968:4) In addition, Grace believed that the operation at Fords would face greater competition in the future. (Robbins Dep. 81:17–82:3)

335. In November 1988, Exxon offered Kaufman $70 million for the total assets of the Fords facility. (1551:24 (Chryss); E1365 at Exxon 0122) This offer was net of a $45 million discount which represented the estimated environmental clean-up costs, (1550:1 (Chryss)), but did not account for the costs associated with the KO24 cleanup. (1614:17 (Chryss))

336. Much of the increase in the value of Hatco since 1978 is attributable to the development, by Hatco, of new products, new technology, and new customers. Hatco transformed itself from a large-volume producer of low-margin chemicals to a specialty chemical business.

337. When a party completes a cleanup pursuant to an ACO, the DEP issues a no-further-action letter which describes terms and conditions of the DEP's approval of the cleanup at that time. (1164:1–5 (Trela)) The no-further-action letter may result in a deed notice or a deed restriction on the title for

the property at the county clerk's office. (1164:6–10 (Trela)) In no-further-action letters, it is standard practice for the DEP to reserve its right at any future time to require additional investigation and/or remediation if the department determines that conditions at the site are a threat to the environment or public health and safety. (1165:7–20 (Trela)) Subsequent investigations and remediation are not atypical even after compliance with an ACO. (1165:21–1166:10 (Trela))

338. Thus, compliance with an ACO combined with the receipt of a no-further-action letter from the DEP does not relieve a company from the burden of complying with later changes in cleanup standards. (1168:4–22 (Trela)) This uncertainty prevents an accurate prediction of the environmental status of the Hatco site subsequent to its compliance with the ACO. (1169:5–20 (Trela))

### 5. Hatco's Failure to Mitigate Damages

339. Whether Hatco failed to mitigate environmental damage at the site is a factor that must be considered in determining the equitable contribution of each party to the remediation of the site. (May 13, 1993 Memorandum Opinion and Order at 7–8)

340. The Court previously held that, at least as early as 1981, Hatco "should have discovered," through "the exercise of reasonable diligence and intelligence," the extent of the environmental damage at and around the site. *Hatco,* 801 F.Supp. at 1323–24.

341. Since its purchase of the Fords site in 1978, Hatco has undertaken four remediation projects: (a) Project 50; (b) Project 51; (c) the removal of PCB-contaminated liquid, including lagoon skimmings, from the site; and (d) the excavation of material from the PA Residue Area. The latter two remediation activities were required by Exxon as conditions precedent to its potential purchase of the facility. (1852:19–23, 1854:17–1855:18 (Chryss); E1365 at Exxon 00135) Hatco itself created the PCB-liquid problem through its lagoon skimming project.

342. At least as early as 1979, the DEP required Hatco to remove contaminated sediments from the lagoons. (E704 at H031658 ¶ 1) In December 1985, the DEP issued Hatco a draft NJPDES permit that directed Hatco to close the lagoons and remove all contaminated soil from the site. (E959; 1422:5–1423:16 (Chryss)) To this date, Hatco has not removed any contaminated soils from the lagoons. (1857:17–1858:17 (Chryss))

343. In January 1986, PS & S submitted a cost estimate of $15.3 million for implementing the requirements of the draft NJPDES permit. (E963 and 964) This figure did not take into consideration the presence of PCBs at the site. (1424:2–1425:18 (Chryss))

344. In October 1987, Hatco estimated that the cost of site-wide excavation and disposal of contaminated soil, as well as groundwater remediation, would be approximately $21,000,000. (E1112) This figure, prepared by DRAI, assumed excavation depths of the former ponds between three and seven feet and soil disposal costs of $280 per ton. (E1112 at H505685, H505683, respectively)

345. In 1988, Grace's counsel noted that it was difficult to determine the extent or cost of the cleanup that would be required. (McNair Stipulation, ¶ 2g)

346. Hatco presently estimates that a site-wide remediation will cost approximately $100,000,000. (1862:23–25 (Chryss))

### 6. Profits from Activities Leading to Environmental Damage

347. The extent to which the parties have profited from activities leading to environmental damage at the site is a factor that must be considered in determining the equitable contribution of each party to the remediation of the site. (May 13, 1993 Memorandum Opinion and Order at 8–9)

348. Grace's after tax proceeds from the sale of the Hatco Chemical Division, including adjustments for inventory, accounts payable and receivables was $10,485,000. (Robbins Stip. ¶ 2f) The cumulative net profit from Grace's nineteen-year ownership of the Hatco Chemical Division was approximately $8,349,000. (*Id.* ¶ 2)

349. Since 1978, Hatco has continued to generate a profit. In this time its sole share-

holder has received substantial dividends including $7.8 million in the previous year. (E1147, 1807, 2141, 2468) Hatco's present retained earnings are in excess of $10.5 million. (E2468)

350. During the lagoon skimming project, Hatco saved an average of $43,000 per month on its regular MCUA charges. (1392:23–1393:15 (Chryss); E987 at H028561–028562)

## II. CONCLUSIONS OF LAW

### A. COUNT ONE—HATCO'S CLAIM UNDER CERCLA

#### 1. Elements of Hatco's Prima Facie Case

1. Section 107(a) of CERCLA, in relevant part, provides:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> * * * * * *
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ...
>
> * * * * * *
>
> from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
>
> * * * * * *
>
> (B) any ... necessary costs of response incurred by any ... person consistent with the national contingency plan.

42 U.S.C. § 9607(a).

2. Thus, to establish that Grace is jointly and severally liable to Hatco under section 107(a), Hatco must make a four-pronged showing:

> (1) that the Hatco property is a "facility;" (2) that a "release" or "threatened release" of a hazardous substance from the Hatco property has occurred; (3) that a release or threatened release of hazardous substances has caused Hatco to incur "response costs;" and (4) that Grace "owned or operated" the Hatco facility at the time that any hazardous substances were disposed of on that site.

*See Hatco,* 801 F.Supp. at 1328 (citing *T & E Industries, Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 708 (D.N.J.1988)).

3. The site at issue in this action is a "facility" under CERCLA, 42 U.S.C. § 9601(9)(B), since it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *See id.* 801 F.Supp. at 1328.

4. The following substances are "hazardous substances" under CERCLA: polychlorinated biphenyls; KO24; di-ethyl phthalate; butyl benzyl phthalate; di-octyl phthalate; di-n-octyl phthalate; naphthalene; bis(2–ethylhexyl) phthalate; di-n-butyl phthalate; toluene; 1,1,1–trichloroethane; 1,1,1–trichloroethylene; 1,2 dichloroethane; and chloroethane. *See* 42 U.S.C. § 9601(14); 40 C.F.R. §§ 302.4 and 401.15.

5. Releases and threatened releases of these hazardous substances have occurred at the Hatco site. *See Hatco,* 801 F.Supp. at 1328.

6. The releases and threatened releases have caused Hatco to incur response costs, including $668,975.43 in undisputed costs incurred between February 1986 and June 1990 in monitoring, assessing and evaluating the extent of contamination at the site. *See id.* at 1328–29.

7. Defendant Grace owned and operated the site between 1959 and 1978 and thus fits the statutory definition of a covered person. *See id.* at 1328.

8. Therefore, Hatco has proven the four elements of liability under section 107 of CERCLA.

#### 2. Grace's Defenses

9. Relying on the defense set forth in section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3), Grace seeks to avoid liability based on the actions of the Hatco Chemical Company, Grace's predecessor in title to the Fords facility. Grace has failed to establish the third-party defense, because it has not shown that the release and threatened re-

leases at issue and the damages resulting therefrom were caused solely by an act or omission of a third party.

10. Grace also relies on *United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992) ("*Alcan*"), which held that a defendant can avoid liability under CERCLA, or diminish the extent of its liability, based upon the divisibility of harm rule.

11. The defense of divisibility recognized in *Alcan* is derived from section 433A of the *Restatement (Second) of Torts* (1965). The *Alcan* court explained that it was "adhering to the rules set forth in the Restatement." *Alcan*, 964 F.2d at 268 n. 26.

12. Section 433A of the *Restatement* provides:

> (1) Damages for harm are to be apportioned among two or more causes where
>
> (a) there are distinct harms, or
>
> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes.

A defendant advancing a divisibility defense under CERCLA therefore must prove either (1) that there are distinct harms or (2) that there is a reasonable basis for determining the contribution of each cause to a single harm (a so-called "divisible harm").

13. A defendant asserting a divisibility defense has the burden of proof as to that defense, and its burden is substantial. *Id.* at 268 & n. 28, 271; *see also O'Neil v. Picillo*, 883 F.2d 176, 183 (1st Cir.1989) (describing burden as "stringent"), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990).

14. If a defendant succeeds in establishing a divisibility defense, it can be held liable only for the response costs relating to that portion of the harm to which it contributed. *Alcan*, 964 F.2d at 271. Thus, under *Alcan*, Grace is not liable for response costs incurred by Hatco that result from Hatco's own post-1978 pollution or inaction and are divisible from harm occasioned by the disposal of hazardous substances during Grace's ownership of the site. *Hatco*, 801 F.Supp. at 1330.

15. To constitute distinct harms under section 433A, the harms must be separate and independent. *See Restatement* section 433A, comment b. The Restatement authors illustrate the concept of distinct harms with a case in which one defendant shoots the plaintiff in the arm and another defendant shoots the plaintiff in the leg.

16. Similarly, fragmenting the Fords site into regions of exclusive use and joint use and viewing each portion singularly reveals distinct harms. Borrowing the Restatement example, Hatco and Grace each shot the Fords site in the arm, but only Grace shot it in the leg. Both apportionment experts agreed that Grace is wholly responsible for any and all contamination found in the portions of the Hatco site that Grace used exclusively.

17. The harm to the remaining portion of the site, used by both parties during their respective periods of ownership, must be classified as a single harm. To avoid liability for the environmental damage in this area, Grace must establish that the harm in question is capable of reasonable apportionment based on the contribution of each party.[27] *United States v. Rohm & Haas*, 2 F.3d 1265, 1280 (3d Cir.1993); *Alcan*, 964 F.2d at 269, 270 & n. 29, 271.

18. "In other words, [Grace] must prove that there is a way to determine what portion of the 'harm' ... is fairly attributable to [Grace], as opposed to other responsible parties." *Rohm & Haas*, 2 F.3d at 1280.

19. To satisfy this requirement, Grace must present a basis for apportionment that is neither theoretical nor arbitrary. *See O'Neil*, 883 F.2d at 183 n. 11. The theory offered must be probative of the contributory harm, and thus Grace must demonstrate the relationship between the basis offered and

27. Hatco describes Grace's showing as two-pronged, stating that it must demonstrate that the harm is divisible and capable of reasonable apportionment. Although this conjunctive phrase appears in *Alcan*, the Court does not interpret this language as requiring dual sets of proof. Only a "divisible" harm is capable of reasonable apportionment.

the release of hazardous substances at the site. *United States v. Monsanto Co.,* 858 F.2d 160, 172 (4th Cir.1988). This requirement has led courts to reject simple source or volume evidence of contaminants as means of apportionment. *See O'Neil,* 883 F.2d at 183 n. 11; *Monsanto Co.,* 858 F.2d at 172.

20. The Court must be satisfied that "it can be reasonably assumed, or it has been demonstrated, that independent factors had no substantial effect on the harm to the environment." *Monsanto,* 858 F.2d at 172 n. 27. Merely establishing that disposals of certain substances are solely attributable to Grace or Hatco does not establish which releases, threatened releases or response costs are attributable to those disposals. *Hatco,* 801 F.Supp. at 1330.

21. At the outset, the Court notes that commingled waste, characteristic of the Fords site, is not synonymous with indivisible harm. *Alcan,* 964 F.2d at 270 n. 29.

22. Time of use provides a reasonable way to determine what portion of the harm is fairly attributable to Grace and Hatco. This method is satisfactory because it directly links the manufacturing and waste disposal activities with the harm to the environment.

23. Use of this means of apportioning liability was endorsed by both apportionment experts and is appropriate in the instant case because the types of use of the site were similar during the parties' respective periods of ownership.

24. Moreover, the exceptions to the similar use assumption, in the instant case, carry with them an alternative means of assigning responsibility such as unique use of chemicals. For example, Grace's use of the hydrotherm units brought PCBs to the site while Hatco's production of ZAA introduced TCA to the site.

25. While time of use and exclusive chemical use drove the apportionment decisions, the Court employed other factors in its calculations. In order to account for the physical conditions at the site, the Court also incorporated the chemical properties and migratory potential of the various substances at the site and natural events such as surface water run-off due to precipitation and seasonal fluctuations in the water table in its analysis.

26. Within this flexible framework, the Court examined each of the twenty-two areas of environmental concern and calculated the respective shares of the parties for each category of chemicals present therein. The results, presented in tabular form, appear in Appendix IV.

27. The Court also calculated overall percentages of responsibility for each category of contaminant. These figures are derived from volumes of contaminated soil[28] in the areas of environmental concern that both Grace and Hatco used and the areas of environmental concern that contain "hot spots." For these fifteen areas of environmental concern, Grace and Hatco will receive the following shares of responsibility: (a) for PCBs: Grace 96.16%; Hatco 3.84%; (b) for BNs: Grace 90.26%; Hatco 9.74; and (c) for VOCs: Grace 84.52%; Hatco 15.48%.

28. Designed to measure harm, but derived from the volumes of impacted soil, these percentages represent interim figures only. The Third Circuit defines harm as the "hazardous substances present at the facility and the response costs incurred in dealing with them." *United States v. Rohm & Haas Co.,* 2 F.3d at 1280 (3d Cir.1993). With the response costs as yet undefined, these percentages may be misleading. For example, if

28. Dr. Raviv presented a similar approach during the trial relying on the total volume of contaminated soil in each area of environmental concern. The Court requested and received more detailed information that provided the volumes of contaminated soil within the subareas of contamination within each area of environmental concern. This additional level of detail allowed a more precise conclusion about the amount of soil impacted with each category of contaminant as well as an exact percentage of responsibility rather than the presentation of a range of liability.

The Court has chosen to adopt the soil estimates of Dr. Raviv. Based on the volumes of actual contamination within each AEC, they represent a better estimate than those Dr. Staples offered through calculations derived from volumes for entire areas based on their surface dimensions and an average depth of contamination.

it is determined that the remediation of PCB contamination will drive the cost of the clean-up, as has been suggested, Grace, which has received a greater share of responsibility for this category of contamination, will fund a larger portion of the response costs.[29]

### 3. Declaration of Liability

29. Liability under section 107 of CERCLA is joint and several, except to the extent that particular harm is divisible. *See Alcan*, 964 F.2d at 268–71; *United States v. Kramer*, 757 F.Supp. 397, 412–13 (D.N.J. 1991).

30. Based on the distinct harms prong of *Alcan*, Grace is liable to Hatco under section 107 of CERCLA for all necessary response costs incurred or to be incurred by Hatco at the Hatco site consistent with the NCP for the remediation of the easternmost portion of the Fords site described by Hatco's expert as areas of environmental concern 6, 7A, 10B, 10C, 14, and 21B. This liability is several.

31. Based on the separable harms portion of *Alcan*, Grace is liable to Hatco under section 107 of CERCLA for any response costs incurred or to be incurred by Hatco for the remediation of the contamination found in the areas of joint use, including hot spots, for which the Court allocated responsibility to Grace.

32. Grace is jointly and severally liable to Hatco under section 107 of CERCLA for all necessary response costs incurred or to be incurred by Hatco at the Hatco site consistent with the NCP for the remediation of metal contamination.

### 4. Necessary Response Costs

33. Liability under CERCLA encompasses all "necessary costs of response." 42 U.S.C. § 9607(a)(4)(B).

34. These necessary costs include expenses for investigating, testing, sampling and monitoring environmental contamination. *Hatco*, 801 F.Supp. at 1328 (citing *Artesian Water Co. v. New Castle County*, 851 F.2d 643, 651 (3d Cir.1988)).

35. Such costs take various forms and may include purchases of equipment to monitor and evaluate contamination, *see BCW Associates, Ltd. v. Occidental Chem. Corp.*, 1988 WL 102641 at *6 1988 U.S.Dist. LEXIS 11275 at 16 (E.D.Pa. Sept. 29, 1988) (No. 86-5947), management time, *T & E Industries*, 680 F.Supp. at 706–07, but not attorney's fees. *See Hatco*, 801 F.Supp. at 1333.

### 5. Prejudgment Interest

36. Hatco is entitled to receive prejudgment interest under section 9607(a), which provides:

> The amounts recoverable in an action under this section shall include interest on the amounts recoverable [such as necessary costs of response consistent with the national contingency plan]. Such interest shall accrue from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of Title 26. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

42 U.S.C. § 9607(a).

37. Pursuant to section 9607, each year the United States Department of the Treasury determines the interest rate for investments in the Hazardous Substance Superfund. *Id.; United States v. LeCarreaux*, 1992 WL 108816 at *3 1992 U.S.Dist. LEXIS

29. In areas that contain PCBs and other categories of contaminants, Grace will be able to deduct Hatco's share of the response costs that have or would be incurred in excess of the response cost allocated to PCB removal. Otherwise, Hatco would bear no financial responsibility for the release of chemicals during its fourteen years of operation.

9365 at *10 (D.N.J. Feb. 18, 1992) (No. 90–1672).

38. The interest rate for Fiscal Year 1989 was 8.39 percent. *LeCarreaux,* 1992 WL 108816 at *3 1992 U.S.Dist. LEXIS 9365 at *10.

39. The interest rate for Fiscal Year 1990 was 8.47 percent. *Id.*

40. The interest rate for Fiscal Year 1991 was 7.99 percent. *Id.*

41. The interest rate for Fiscal Year 1992 was 5.70 percent. *Id.*

42. The interest rate for Fiscal Year 1993 is 3.49 percent. Memorandum from Office of Comptroller, U.S. Environmental Protection Agency to Assistant Regional Administrators (Sept. 9, 1992).

43. The award of prejudgment interest is consistent with the restitutional purposes of CERCLA and Congress's intent to facilitate complete reimbursement, *see Monsanto,* 858 F.2d at 176, and it does not carry an implication that defendant has sought to delay litigation or has been recalcitrant, deceptive or unreasonable.

**6. Grace's Counterclaim for Contribution**

44. Grace seeks contribution from Hatco under section 113(f)(1) of CERCLA, which provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.

42 U.S.C. § 9613(f)(1).

45. Grace bears the burden of proof on its claim for contribution under CERCLA. *See* H.R.Rep. No. 99–253 (III), 99th Cong. 1st Sess. 19 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2835, 3038, 3042.

46. In resolving contribution claims, section 113(f)(1) continues, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). In any given case, "a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of the circumstances presented to the court." *Environmental Transp. Sys., Inc. v. Ensco, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). Thus, there is no precise or exclusive list of equitable factors to which the Court can or must turn to guide the instant determination.

47. Although causation of harm serves as the touchstone for the divisibility and contribution inquiries, *Alcan,* 964 F.2d at 270 n. 29, the causation result under section 107 does not create a ceiling for contribution under section 113 which is designed to reduce any unfair burden the strict section 107 analysis imposes. *See United States v. R.W. Meyer, Inc.,* 932 F.2d 568, 572–73 (6th Cir. 1991). Thus, if the Court apportions Grace ninety percent of the liability under section 107, it also may require Hatco to contribute in excess of ten percent under section 113.

48. The equitable factors that guide the Court's evaluation of Grace's claim for contribution include: (1) the knowledge Kaufman acquired during his Grace employment and his acquiescence in contaminating activities following Hatco's purchase of the site; (2) the degree of care exercised by the parties, taking into account the relevant statutes and regulations; (3) the degree of cooperation with federal, state and local officials exhibited by the parties to prevent harm to public health or the environment, without regard to periods of ownership; (4) any financial benefit to the parties arising from remediation; (5) the extent to which Hatco undertook reasonable efforts to mitigate the environmental damage; and (6) any benefits the parties received from the activities that lead to the environmental damage.

49. Turning first to the knowledge of Kaufman, the Court concludes that this individual's tenure at Hatco does not warrant an adjustment of the section 107 liability apportionment. As a member of the front office throughout most of his career, Kaufman did not gain the familiarity with the mechanics of

Hatco plant operations necessary to anticipate the present environmental damage at the site. For example, Kaufman had no knowledge of aroclor use at the plant, nor did he play a role in the design or operation of the settling pond system, two of the main sources of contamination at the site.

50. Kaufman's command of chemistry, clearly demonstrated at trial, does not alter this conclusion. Kaufman capitalized on the value of this background, not in his backyard at Fords, but in the chemical industry as a whole. Through innovation and integration, Kaufman built profitable chemical businesses for Grace and eventually for himself.

51. The due care inquiry is less straightforward. Although in hindsight its actions suggest recklessness, the environmental and waste disposal practices of Grace's Hatco Chemical Division were in accordance with the applicable standards of the period. With respect to the Fords property, the only concerns environmental regulatory agencies raised involved air pollution and surface-water contamination. (Napack Dep. 88:3–89:13) Indeed, odor complaints led to the closure of the settling ponds, and a desire to protect the Raritan River sparked the connection to the MCUA. It was not until the late 1970s and early 1980s that regulators broadened their focus to include on-site as well as off-site contamination threats.

52. Against this heightened awareness, the Court must evaluate Hatco's practices. The evidence indicates that Hatco continued to make use of contaminated areas of the site long after it was aware that such use could worsen contamination or complicate future remedial efforts.

53. Specifically, Hatco discounted the advice of its outside environmental consultant and constructed a new facility in the former ponds region, an area of known contamination. In addition, Hatco continued to use the lagoons to capture sewer overflows and to receive contaminated railroad swale run-off, contrary to the admonitions of counsel and its environmental manager.[30]

54. As site delineation continues, any enhanced lagoon contamination demonstrated by subsequent sampling results will be Hatco's sole burden. Any expenditure beyond that required by apportionment to remediate the ponds region due to the EPT plant placement shall also be borne by Hatco.

55. With respect to the degree of cooperation with federal, state and local officials, the Court concludes that neither party exhibited particularly admirable or culpable behavior. Both Grace and Hatco took a cautious approach, hesitating to comply with regulators' demands as long as negotiations for a more advantageous outcome remained open.[31] Little more can be expected from for-profit institutions that must protect the interests of employees and shareholders.

56. An evaluation of the extent to which Hatco will benefit from the remediation of the site requires an examination of whether Hatco paid a reduced price for the site or whether remediation will enhance the value of the property beyond any expected appreciation.

57. Grace has not shown that Hatco paid a reduced price for the Fords site. Any such reduction, however, stemmed from the almost certain loss of raw material supply and resultant anticipated decrease in plant output and revenues.

58. Nor is it likely that Hatco will realize a windfall from remediation efforts. Several potential purchasers of the site balked during negotiations when Hatco revealed the nature of its environmental difficulties. Due to the DEP's refusal to relinquish its right to demand additional remediation as future regulations tighten, such concerns likely will survive remediation.

30. The Court also must express dismay with Hatco's decision to skim the lagoons. However, the apportionment portion of today's decision incorporated Hatco's responsibility for the skimming project and the resultant storage of PCB–liquids throughout the site. To the extent that the activities of the parties have been incorporated in the section 107 apportionment determination, they will not serve as a basis for reallocation of responsibility for remediation.

31. To some extent, the halting behavior of the parties may have been the result of the often uncoordinated efforts of the DEP.

59. With respect to Hatco's mitigation of damages, Grace correctly argues that, despite its expression of "concern" about PCBs, Hatco management consistently discounted evidence of PCB contamination, except when it perceived a financial benefit in addressing the PCB problem at the site. (1319:17–1320:15, 1321:6–10 (Reid)) Even when evaluated in light of the behavior of Grace and the positions taken by government officials, 1985 not 1988 should have marked the commencement of Hatco's remedial investigation.

60. Yet, the evidence does not indicate that, if Hatco had not delayed investigation and remediation of the portions of the site already contaminated at the time of its purchase, less remediation would have been necessary or that the necessary remediation would have been less expensive. The increase in remediation cost estimates reflect better delineation of the quantity and quality of the contamination.

61. Lastly, Grace seeks to reduce Hatco's recovery based on the benefits it received from the activities that gave rise to the environmental damage at issue. Although Grace demonstrated the savings Hatco enjoyed during its lagoon skimming project, the Court previously incorporated the harm associated with this project into the apportionment equation.

## B. COUNT FOUR—HATCO'S CLAIM FOR CONTRIBUTION UNDER THE SPILL ACT

### Elements of Hatco's Prima Facie Case

62. Under the New Jersey Spill Compensation and Control Act ("Spill Act")

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharge of a hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

N.J.S.A. 58:10–23.11f.a(2).

63. Under the Spill Act, as under CERCLA, liability is joint and several. N.J.S.A. 58:10–23.11g.c(1); *In re Kimber Petroleum Corp.,* 110 N.J. 69, 539 A.2d 1181, 1189 (1988).

64. With regard to the elements of a claim for contribution, the Spill Act continues:

> In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of ... (C.58:10–23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of ... (C.58:10–23.11g).

N.J.S.A. 58:10–23.11f.a(2).

65. With the exception of sewage and sewage sludge, the term "hazardous substances" under the Spill Act includes the list of hazardous substances adopted by the federal Environmental Protection Agency pursuant to section 101 of CERCLA, such as those substances set out in paragraph 4 *supra. See* N.J.S.A. 58:10–23.11b.k.

66. The Spill Act defines a discharge as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or into the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State." N.J.S.A. 58:10–23.-11b.h.

67. N.J.S.A. 58:10–23.11g.c(1) provides: "Any person who has discharged a hazardous substance, or is any way responsible for any hazardous substance, shall be strictly liable, without regard to fault, for all cleanup and removal costs no matter by whom incurred."

68. Grace discharged hazardous substances at the site.

69. The only defenses to liability available to a contribution defendant in an action under the Spill Act are the defenses set forth in N.J.S.A. 58:10–23.11g.d, namely, "an act or omission caused solely by war, sabotage, or

God, or a combination thereof." Grace has not established any of these defenses.

70. To qualify as a contribution plaintiff, Hatco must demonstrate that it has cleaned up and removed a discharge of a hazardous substance.

71. With respect to the cleanup and removal of hazardous substances, the Spill Act provides that these actions "shall, to the greatest extent possible, be in accordance with the National Contingency Plan." N.J.S.A. 58:10–23.11f.a(3).

72. Although the provision of the Spill Act that authorizes contribution claims does not mention NCP compliance, it limits the class of authorized contribution seekers to those "dischargers or persons" who "cleans up and removes a discharge of a hazardous substance." The terms and conditions that attach to cleanup and removal in subsection 11f.a(3) also apply to 11f.a(1).

73. A determination of whether Hatco is entitled to recover on its contribution claim under the Spill Act must await the upcoming trial on NCP compliance.

## III. RETAINING JURISDICTION

74. Because the present delineation of the contamination at the site is ongoing,[32] the Court will retain jurisdiction to monitor adjustments in the volumes of contaminated soil and ultimately, once the risk assessment and the remediation plan have been devised and approved by the state, to determine the parties' respective shares of response costs.

75. The parties shall jointly submit an Order in conformity with this Opinion within ten (10) days of the date hereof.

## APPENDIX I

### A. TERMINOLOGY

1. **absorb:** chemical reaction between chemical substance and surface of soil particles (473:18 (Raviv))

2. **action level:** guideline based on hazard chemical poses to humans in residential and nonresidential areas; used to determine which areas of site will require remediation (282:3 (Raviv)); (distinguish chemical concentrations that determine what form remediation will take (71:14) (Raviv))

3. **adsorb:** physical binding of chemical substance to the surface of soil particles (473:17 (Raviv))

4. **daughter products:** chemical by-products of biological degradation

5. **hot spots:** location at which exceedence concentrations are found, but neighboring sampling points were below actionable levels (110:10 (Raviv))

6. **in situ treatment:** biological treatment of the contaminated material without removing it from the site (293:17 (Raviv)) that changes the chemistry of the material (363:14 (Raviv))

7. **leaching:** non-neutralizing process by which one chemical moves another chemical absorbed on soil particles into liquid solution (242:24 (Raviv))

8. **nonaqueous phase layer ("NAPL"):** oily layer which floats on top of water table (2113:9 (Staples))

9. **off-color plasticizer:** recycling of raw materials reclaimed from waste stream to make plasticizers (697:3 (Raviv))

10. **parts per billion ("ppb"):** measure of contamination in groundwater (71:6 (Raviv))

11. **parts per million ("ppm"):** measure of contamination in soil; milligrams per kilogram (71:3 (Raviv))

12. **plume:** impacted region of aquifer where chemical concentrations above background levels (222:6 (Raviv))

13. **sludge:** black material which is very soft and sometimes wet (396:9 (Raviv))

14. **solubility:** measures degree to which certain chemical compound will dissolve into water or other chemicals (464:16 (Raviv))

15. **split sample:** single sample divided between two entities and analyzed by different labs (28:25 (Raviv))

32. For example, the Raviv sampling plan contains only limited sampling in the Ester I area, historically the main processing area of the site. (2173:11–13 (Staples); E2487, Vol. II)

16. **subsurface:** any depth below two feet (R108:5)

17. **targeted compounds:** compounds contained in an USEPA list that are hazardous or most occurring in areas with environmental problems (91:18 (Raviv))

18. **volatility:** measurement of ability of chemical to move from solid or liquid phase to atmosphere (2074:11 (Staples))

## APPENDIX II—NONTESTIFYING WITNESSES:

1. **Oscar Acklesberg** was the Vice President of Operations of the Hatco Chemical Division from 1964 to 1969.

2. **Hugo Bierteumpfel** was the Chief Engineer of the Hatco Chemical Division from 1967 to 1971 and Plant Manager of the Division from 1971 to 1978. After the 1978 sale, he was the Plant Manager for the Hatco Corporation from 1978 to 1979.

3. **Steven Bonk** was the Hatco Chemical Division's Ester Plant Operator from 1962 to 1963, Ester I Foreman from 1963 to 1976, and Industrial Relations Manager from 1976 to 1978. Since the sale, he has served as the Hatco Corporation's Industrial Relations Manager from 1978 to 1979 and Ester I Plant Manager from 1979 to the present.

4. **Thomas Boyd** was Hatco Chemical Division's Ester I Plant Supervisor from 1959 to 1964, Assistant to the Vice President of Operations from 1964 to 1966, Manager of the Plasticizer, Sebacic Acid and Benzyl Chloride Plants from 1966 to 1967 and Affirmative Action Officer from 1967 to 1975.

5. **David Cesareo** was Hatco Corporation's Director of Environmental Affairs from 1990 to 1991.

6. **Clay Chen** was Hatco Corporation's Pilot Plant Operator from 1982 to 1983, Process Development Specialist of the Corporation from 1983 to 1984, Pilot Plant Supervisor from 1984 to 1986, R & D Technical Manager from 1986 to 1988, and R & D Senior Chemist from 1989 to the present.

7. **Raymond Chism** was the Electrician at the Hatco Chemical Division from 1958 to 1960, Electrical and Instrumentation Foreman of the Division from 1960 to 1978, and Electrical and Instrumentation Foreman of the Hatco Corporation from 1978 to 1987.

8. **Richard Conway** was a member of the firm of Hannoch Weisman, counsel to Grace.

9. **Dr. Donald B. Denney** is a professor of chemistry at Rutgers University who has served as an outside consultant to the Hatco Chemical Division and Hatco Corporation on a periodic basis since 1956.

10. **Eugene Dominach** was the Hatco Chemical Division's Engineer from 1965 to 1973 and Plant Engineer Specialist from 1973 to 1978. After the 1978 sale, he was Hatco Corporation's Plant Engineer Specialist from 1978 to 1985, and Manager of the Safety and Environmental Department in 1985.

11. **Gerald Donnelly** was a Hatco Group executive from 1970 to 1978, and Executive Vice President of Hatco Corporation from 1991 to the present.

12. **Emil Genetelli** is a professor of environmental studies at Rutgers University who worked as an independent consultant to the Hatco Chemical Division in the 1960's.

13. **John Goyette** was Hatco Corporation's Maintenance Manager from 1983 to 1985.

14. **William Grassmyer** was Hatco Corporation's Plant Manager from 1986 to 1988, Environmental Manager in 1988 and Special Projects Manager from 1988 to the present.

15. **John Gutai** was the Hatco Chemical Division's Production Manager from 1962 to 1963, Process Engineer from 1963 to 1964, Manager of Commercial Development from 1964 to 1972, Manager of Operations from 1972 to 1974 and Director of Commercial Development from 1975 to 1978.

16. **Chuen–Hwe Nelson Ho** was the Manager of Safety and Environment for the Hatco Corporation for approximately eight months in 1986.

17. **Randolph Jacobs** was the Manager of Environmental Safety of the Hatco Corporation from 1987 to 1989.

18. **Charles Lynch** was Hatco Corporation's Technical Director of Synthetic Lubricants and Fluids from 1981 to 1983, Director

of Sales and Marketing from 1983 to 1988, and Vice President of Hatco Advanced Technologies Corporation from 1988 to the present.

19. **Aaron Maimon** was Hatco Corporation's Pilot Plant Manager from 1982 to 1983, Production Manager of the ZAA Plant from 1983 to 1989 an Manager of Engineering and Maintenance from 1989 to the present.

20. **William McDonough** was the Electrician at the Hatco Chemical Division from 1960 to 1971, and at Hatco Corporation from 1983 to 1984, and Supervisor of the Electrical and Instrumentation Department of Hatco Corporation from 1984 to the present.

21. **George McNair** was a member of the Grace legal department since 1963, who became General Counsel in 1987.

22. **Lance Miller** was Assistant Commissioner of the Site Remediation Program of the NJDEPE since 1990.

23. **Richard Miller** was the Hatco Chemical Division's Director of Research and Development from 1959 to 1969.

24. **James Millikin** was Hatco's Manager of Environmental Affairs from 1991 to the present.

25. **James Mustacchio** was Hatco's Director of Operations from 1989 to 1990 and Vice President of Operations from 1990 to the present.

26. **Joseph Nagiewicz** was a carpenter and plant foreman to the Hatco Chemical Division from 1962 to 1978, and foreman and maintenance supervisor at the Hatco Corporation from 1978 to the present.

27. **George Napack** was the Manager of the Hatco Chemical Division PA Plants from 1961 to 1964, Ester I Operations Manager of the Division from 1964 to 1966, Manager of Special Projects Division from 1966 to 1975, Vice President of the Division from 1975 to 1978, Vice President and General Manager of the Hatco Corporation from 1978 to 1986, and Consultant to the Hatco Corporation from 1986 to 1990.

28. **Randy Parr** is a member of the firm of Anderson Kill Olick & Oshinsky, counsel to Grace.

29. **Henry Pazinski** was the Supervisor of Technical Services of the Hatco Chemical Division from 1969 to 1978, the Hatco Corporation's Supervisor of Technical Services from 1978 to 1979, a member of the Research and Development Department from 1984 to 1985, Environmental Coordinator from 1985 to 1989 and Environmental Specialist from 1989 to the present.

30. **D. Walter Robbins** was an employee of Grace since 1952 and current member of the Grace Board of Directors.

31. **Martin Roth** was the Hatco Chemical Division's Technical Sales Representative from 1964 to 1967, Assistant General Sales Manager from 1967 to 1972, and Manager of Operations from 1972 to 1978.

32. **Larry Rotter** was Hatco Corporation's Plant Manager in 1985.

33. **Harland Rush** was the PA Plant Foreman of the Hatco Chemical Division from 1961–62, PA Plant Foreman of the Division from 1962 to 1964, Manager of Traffic and Warehousing of the Division from 1966–1968, and Manager of Engineering and Maintenance of the Hatco Corporation from 1981 to 1986.

34. **"Sewers Dep."** refers to the designated pages of the Transcript of the Rule 30(b)(6) Deposition of Hatco Corporation on the issue.

35. **Andrew Soos** was Hatco's Manager of Environmental Affairs from 1988 to 1990.

36. **Mark Stoler** was Grace's Chief Environmental Health and Safety Counsel.

37. **Peter Vogt** was Hatco's Vice President of Operations from 1988 to 1989.

## APPENDIX III

MAP SOURCE

# EXPLANATION

| | |
|---|---|
| ———— | WATER BORDER |
| - - - - - - | PAVEMENT BORDER |
| —x—x—x— | FENCE |
| ———— | FACILITY BOUNDARY |
| (1) | AREAS OF ENVIRONMENTAL CONCERN (AEC) |

| AEC No. | DESCRIPTION |
|---|---|
| 1 | CAPPED LAGOONS (OUT OF SERVICE) |
| 2 | FORMER PONDS AREA |
| 3 | RAILROAD SIDING AREA |
| 4 | ESTER I BUILDING |
| 5 | ESTER II BUILDING |
| 6 | PHTHALIC ANHYDRIDE PROCESS AREA |
| 7A | PHTHALIC ANHYDRIDE RESIDUE AREA |
| 8 | TARRY AREA |
| 9A | ESTER I TANK FARM |
| 9B | ALCOHOL TANK FARM |
| 9C | NAPHTHALENE TANK FARM |
| 9D | SCALES TANK AREA |
| 9E | No.6 FUEL OIL TANK AREA |
| 10A | CURRENT DRUM AND WASTE STORAGE AREA |
| 10B | FORMER DRUM AND WASTE STORAGE AREA (NORTH OF WAREHOUSE NO.5) |
| 10C | FORMER DRUM AND WASTE STORAGE AREA (WEST OF WAREHOUSE NO 4) |
| 11A | UNDERGROUND STORAGE TANK (UST) AREA (MAINTENANCE BUILDING) |
| 11B | SALT UST AREA |
| 12 | TRANSFORMERS |
| 13 | SOUTHEAST (S.E.) FILL AREA |
| 14 | NAPHTHALENE AREA |
| 15 | SITE-WIDE GROUND WATER (NOT SHOWN) |
| 16 | RESEARCH AND DEVELOPMENT LABORATORY |
| 17 | CLEAN FILL AREA |
| 18A | PILOT PLANT I |
| 18B | PILOT PLANT II |
| 19 | ZAA PROCESS AREA |
| 20 | AREA EAST OF SLING TAIL CREEK |
| 21A | CROW'S MILL TRIBUTARY |
| 21B | SLING TAIL CREEK |
| 22 | SITE-WIDE SEWER SYSTEM (NOT SHOWN) |

(21B) AEC OF SURFACE DRAINAGE

0 240 FT.
APPROXIMATE SCALE

Dan Raviv Associates, Inc.
57 E. Willow Street Millburn, NJ 07041

SITE MAP AND
AREAS OF ENVIRONMENTAL CONCERN

HATCO CORPORATION – FORDS, NEW JERSEY

| PREPARED BY: DDR/LB | DATE: JANUARY 1993 |
|---|---|
| JOB NO.: 86C289-L | FIGURE: A |

289-GH3

# APPENDIX IV

CONTAMINATION ANALYSIS

| AEC NAME | AEC | VOLUMES | VOL % | PCB | BN | VOC | G-PCB | G PCB VOL | H-PCB | H PCB VOL | G-BN | G BN VOL | H-BN | H BN VOL | G-VOC | G VOC VOL | H-VOC | H VOC VOL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LAGOONS | AEC 1-AE | 2,022 5 | 2 29% | 1 | 1 | 1 | 1 | 2,022 5 | 0 | 0 0 | 0 732 | 1,480 5 | 0 268 | 542 0 | 0 732 | 1,480 5 | 0 268 | 542 0 |
| | AEC 1-AW | 2,022 5 | 2 29% | 1 | 1 | 1 | 1 | 2,022 5 | 0 | 0 0 | 0 732 | 1,480.5 | 0 268 | 542 0 | 0 | 0 0 | 1 | 2,022 5 |
| | AEC 1-BE | 2,022 5 | 2 29% | 1 | 1 | 0 | 0 732 | 1,480 5 | 0 268 | 542 0 | 0 732 | 1,480 5 | 0 268 | 542 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 1-BW | 2,022 5 | 2 29% | 1 | 1 | 1 | 0 732 | 1,480 5 | 0 268 | 542.0 | 0.732 | 1,480 5 | 0 268 | 542 0 | 0 | 0 0 | 1 | 2,022 5 |
| PONDS | AEC 2-A | 505 0 | 0 57% | 0 | 1 | 1 | 0 | 0 0 | 0 | 0 0 | 1 | 505 0 | 0 | 0 0 | 0 931 | 470 2 | 0 069 | 34 8 |
| | AEC 2-B | 23,000 0 | 26 02% | 1 | 1 | 1 | 1 | 23,000 0 | 0 | 0 0 | 0 931 | 21,413 0 | 0 069 | 1,587 0 | 0 931 | 21,413 0 | 0 069 | 1,587 0 |
| | AEC 2-C | 41,360 0 | 46 78% | 1 | 1 | 1 | 1 | 41,360 0 | 0 | 0 0 | 1 | 41,360 0 | 0 | 0 0 | 0 931 | 38 506 2 | 0 069 | 2,853 8 |
| RR SIDING | AEC 3-C | 255 0 | 0 29% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 558 | 142 3 | 0 442 | 112 7 | 0 | 0 0 | 0 | 0 0 |
| | AEC 3-D | 225 0 | 0 25% | 1 | 1 | 0 | 1 | 225 0 | 0 | 0 0 | 0 558 | 125 6 | 0 442 | 99 5 | 0 | 0 0 | 0 | 0 0 |
| | AEC 3-E | 880 0 | 1 00% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 558 | 491 0 | 0 442 | 389 0 | 0 | 0 0 | 0 | 0.0 |
| ESTER I | AEC 4-A | 65 0 | 0 07% | 0 | 0 | 1 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 37 4 | 0 424 | 27 6 |
| | AEC 4-B | 80 0 | 0 09% | 1 | 0 | 0 | 1 | 80 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 4-C | 1,180 0 | 1 33% | 1 | 0 | 1 | 1 | 1,180 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 679 7 | 0 424 | 500 3 |
| | AEC 4-D | 240 0 | 0 27% | 1 | 1 | 0 | 1 | 240 0 | 0 | 0 0 | 0 576 | 138 2 | 0 424 | 101 8 | 0 | 0 0 | 0 | 0 0 |
| ESTER II | AEC 5-A | 180 0 | 0 20% | 1 | 0 | 0 | 0 | 0 0 | 1 | 180 0 | 0 | 0 0 | 0 | 0.0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-B | 140 0 | 0 16% | 1 | 0 | 0 | 0 | 0 0 | 1 | 140 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-C | 120 0 | 0 14% | 1 | 0 | 0 | 0 | 0 0 | 1 | 120 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-D | 100 0 | 0 11% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 597 | 59 7 | 0 403 | 40 3 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-E | 70 0 | 0 08% | 1 | 1 | 0 | 0 | 0 0 | 1 | 70 0 | 0 597 | 41 8 | 0 403 | 28 2 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-F | 130 0 | 0 15% | 1 | 1 | 0 | 0 | 0 0 | 1 | 130 0 | 0 597 | 77 6 | 0 403 | 52 4 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-G | 50 0 | 0 06% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 597 | 29 9 | 0 403 | 20 2 | 0 | 0 0 | 0 | 0 0 |
| | AEC 5-H | 430 0 | 0 49% | 1 | 0 | 0 | 0 | 0 0 | 1 | 430 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| TARRY | AEC 8-A | 105 0 | 0 12% | 1 | 0 | 0 | 1 | 105 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 8-B | 85 0 | 0 10% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 49 0 | 0 424 | 36 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 8-C | 360 0 | 0 41% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 207 4 | 0 424 | 152 6 | 0 | 0 0 | 0 | 0 0 |
| ESTER I TANK | AEC 9A-A | 440 0 | 0 50% | 0 | 1 | 1 | 0 | 0 0 | 0 | 0 0 | 0 576 | 253 4 | 0 424 | 186 6 | 0 576 | 253 4 | 0 424 | 186 6 |
| | AEC 9A-B | 470 0 | 0 53% | 1 | 1 | 0 | 0 949 | 446 0 | 0 051 | 24 0 | 0 576 | 270 7 | 0 424 | 199 3 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9A-C | 1 335 0 | 1 51% | 1 | 1 | 1 | 0 949 | 1,266 9 | 0 051 | 68 1 | 0 576 | 769 0 | 0 424 | 566 0 | 0 576 | 769 0 | 0 424 | 566 0 |
| | AEC 9A-D | 2,890 0 | 3 27% | 1 | 1 | 1 | 1 | 2 890 0 | 0 | 0 0 | 0 576 | 1,664 6 | 0 424 | 1,225 4 | 0.576 | 1,664 6 | 0 424 | 1,225 4 |
| ALCOHOL | AEC 9B-A | 185 0 | 0 21% | 1 | 0 | 0 | 1 | 185 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9B-B | 710 0 | 0 80% | 1 | 0 | 0 | 1 | 710 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| M TANKS | AEC 9C-A | 360 0 | 0 41% | 1 | 1 | 0 | 0 | 0 0 | 1 | 360 0 | 0.667 | 240 1 | 0 333 | 119 9 | 0 | 0.0 | 0 | 0 0 |
| | AEC 9C-B | 45 0 | 0 05% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 667 | 30 0 | 0 333 | 15 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9C-C | 113 0 | 0 13% | 1 | 0 | 0 | 0 | 0 0 | 1 | 113 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9C-D | 142 0 | 0 16% | 1 | 1 | 0 | 0 | 0 0 | 1 | 142 0 | 0 667 | 94 7 | 0 333 | 47 3 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9C-E | 30 0 | 0 03% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 667 | 20 0 | 0 333 | 10 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9C-F | 40 0 | 0 05% | 0 | 1 | 0 | 0 | 0.0 | 0 | 0 0 | 0 667 | 26 7 | 0 333 | 13 3 | 0 | 0 0 | 0 | 0 0 |
| SCALES | AEC 9D-A | 410 0 | 0 46% | 1 | 0 | 0 | 1 | 410 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 9D-B | 225 0 | 0 25% | 1 | 0 | 0 | 1 | 225.0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| TRANSFORMERS | AEC 12-A | 25 0 | 0 03% | 1 | 0 | 0 | 0 | 0 0 | 1 | 25 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 12-B | 330 0 | 0 37% | 1 | 0 | 0 | 0 | 0 0 | 1 | 330 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 12-C | 45 0 | 0 05% | 1 | 0 | 0 | 0 | 0 0 | 1 | 45 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| SE FILL | AEC 13-A | 190 0 | 0 21% | 1 | 0 | 0 | 1 | 190 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |
| | AEC 13-C | 50 0 | 0 06% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 28 8 | 0 424 | 21 2 | 0 | 0 0 | 0 | 0 0 |
| PILOT #2 | AEC 18B-A | 180 0 | 0 20% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 103 7 | 0 424 | 76 3 | 0 | 0 0 | 0 | 0 0 |
| | AEC 18B-B | 240 0 | 0 27% | 1 | 1 | 0 | 1 | 240 0 | 0 | 0 0 | 0 576 | 138 2 | 0 424 | 101 8 | 0 | 0 0 | 0 | 0 0 |
| ZAA | AEC 19-A | 185 0 | 0 21% | 1 | 0 | 1 | 1 | 185 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 106 6 | 0 424 | 78 4 |
| | AEC 19-B | 1,350 0 | 1.53% | 1 | 1 | 0 | 1 | 1,350 0 | 0 | 0 0 | 0 576 | 777 6 | 0 424 | 572 4 | 0 | 0 0 | 0 | 0 0 |
| | AEC 19-C | 90 0 | 0 10% | 0 | 1 | 0 | 0 | 0 0 | 0 | 0 0 | 0 576 | 51 8 | 0 424 | 38.2 | 0 | 0 0 | 0 | 0 0 |
| | AEC 19-D | 325 0 | 0 37% | 0 | 1 | 1 | 0 | 0 0 | 0 | 0 0 | 0 576 | 187 2 | 0 424 | 137 8 | 0 | 0 0 | 1 | 325 0 |
| CROWS | AEC 21A | 350 0 | 0 40% | 1 | 0 | 0 | 1 | 350 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 | 0 | 0 0 |

| | | |
|---|---|---|
| Total Actual Volume | 88,405 0 | 100 00% |
| Volume w/PCB | 84,905 0 | 96 04% |
| Volume w/BN | 83,337 0 | 94 27% |
| Volume w/VOC | 77,352 5 | 87 50% |

| | | | | | |
|---|---|---|---|---|---|
| G PCB Vol | 81,643 9 | H PCB Vol | 3,261.1 | G BN Vol | 75,218 9 |
| % total PCB | 96 16% | % total PCB | 3 84% | % total BN | 90 26% |
| H BN Vol | 8,118 1 | G VOC Vol | 65 380 5 | H VOC Vol | 11,972 0 |
| % total BN | 9 74% | % total VOC | 84 52% | % total VOC | 15 48% |